Woody K. LESIKAR, Individually and as Trustee of the Woodrow V. Lesikar Family Trust, Trustee of the Woody K. Lesikar Special Trust, and as Independent Executor of the Woodrow V. Lesikar Estate, Appellant,

v.

Carolyn Ann Lesikar MOON, Individually and as Named Trustee of the Carolyn Ann Lesikar Moon Special Trust, Appellee.

No. 14–05–01246–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 10, 2007.

Rehearing Overruled Oct. 18, 2007.

Jason Bradley Ostrom, James Stephen Barrick, Murry B. Cohen, Houston, for appellants.

Bobbie G. Bayless, Brett Wagner, David W. Holman, Houston, for appellee.

Panel consists of Justices YATES, ANDERSON, and HUDSON.

## OPINION

J. HARVEY HUDSON, Justice.

Appellant, Woody K. Lesikar, Individually and as Trustee of the Woodrow V. Lesikar Family Trust, Trustee of the Woody K. Lesikar Special Trust, and as Independent Executor of the Woodrow V. Lesikar Estate, appeals the trial court's final judgment entered in favor of appellee, Carolyn Ann Lesikar Moon, Individually and as Named Trustee of the Carolyn Ann Moon Lesikar Special Trust. We affirm, in part, and reverse and remand, in part.

### BACKGROUND

Woody Lesikar and Carolyn Ann Lesikar Moon are the son and daughter of Woodrow V. Lesikar. In January 1990, Mr. Lesikar established the Woodrow V. Lesikar Family Trust ("Family Trust"), naming himself and Woody as co-trustees. In 1991, Mr. Lesikar revoked, in writing, part of the Family Trust. On March 16, 1998, Mr. Lesikar amended the Family Trust, effective as of December 31, 1997. After the distribution of other bequests, the Amended Family Trust provided that the remainder of the trust assets would be divided equally between Woody and Carolyn and placed into a special trust for each of them. Woody would be the trustee of his special trust, while Carolyn would be

the trustee of her special trust. Mr. Lesikar died on January 28, 2001, thereby making the Amended Family Trust irrevocable and Woody the sole trustee of the Family Trust.

On August 19, 2003, Carolyn filed a petition for construction of the trust, declaratory judgment, accounting, imposition of a constructive trust, appointment of a receiver, and injunctive relief. Carolyn alleged claims against Woody for breach of fiduciary duty, conversion, negligence, civil conspiracy, and tortious interference with inheritance. As relevant to this appeal, Carolyn sought to compel Woody to fund and relinquish control of her special trust.

On July 22, 2004, Carolyn filed a motion for partial summary judgment arguing she, not Woody, is trustee of her special trust, as a matter of law. Carolyn further requested that the trial court order Woody to partition the then existing Family Trust assets, distribute her share of the assets to her special trust, and relinquish control of her special trust to her as trustee of her trust. In his response to Carolyn's motion for partial summary judgment, Woody argued that because, in his belief, Carolyn is unable to manage her share of the Family Trust assets, he, in his unfettered discretion, could choose not to fund her special trust. Woody also filed a counter-motion for summary judgment in which he similarly argued he has unfettered discretion in determining whether to make distributions to Carolyn's special trust. On March 28, 2005, the trial court granted Carolyn's motion for summary judgment, finding, as a matter of law, Carolyn to be the trustee of her special trust, and denied Woody's counter-motion for summary judgment on this issue.

On November 8, 2004, the trial court, on its own motion, appointed a special master to examine the Family Trust's books and records, devise a plan for the distribution of the Family Trust assets, and prepare a report to the court.

On May 27, 2005, Woody filed a second supplemental answer, plea to the jurisdiction, special exceptions, and counterclaim, alleging that Carolyn, by filing and pursuing this action, contesting the terms of the trust declaration creating the Family Trust and the operations and distributions of the trust, has forfeited her interest in the trust under the *in terrorem* clause. Woody also filed a motion for interlocutory summary judgment arguing that under the *in terrorem* clause, Carolyn has forfeited her share of the Family Trust by bringing this lawsuit. Carolyn filed a motion to strike Woody's second supplemental answer and his motion for interlocutory summary judgment. The trial court did not rule on either Woody's motion for summary judgment or Carolyn's motion to strike.

On June 6, 2005, the trial court adopted, in part, the special master's report.[1] The trial court did not adopt the report with respect to an issue regarding a $200,000 contingent fee liability, reserving that issue for trial. On June 10, 2005, the trial court conducted a bench trial on the $200,000 contingent fee liability issue and Carolyn's attorney fees.

On September 13, 2005, the trial court entered a final judgment specifying which Trust assets are to be distributed to Woody's and Carolyn's special trusts and those that are to remain in the Family Trust for distribution to other beneficiaries. The final judgment also awards Carolyn $400,000 in attorney fees, after being

---

1. As discussed below, Woody disputes June 6, 2005 as the date the trial court adopted the special master's report, arguing the trial court did not adopt the special master's report until June 8, 2005.

adjusted to equalize the division of assets between Woody's and Carolyn's special trusts and the Family Trust, resulting in a net attorney fee award of $273,257. The judgment also states Carolyn nonsuited her other causes of action still pending in the case without prejudice to refiling.

In this appeal, Woody argues the trial court improperly interfered with his discretion as trustee, erred in finding Carolyn the trustee of her special trust, erred in rejecting his *in terrorem* defense, erred in adopting the special master's report and denying him a jury trial, and abused its discretion in awarding Carolyn $400,000 in attorney fees.

### TRUSTEE'S DISCRETION

In his first issue, Woody claims the trial court interfered with his discretion as trustee by ordering him to fund Carolyn's special trust, without a predicate finding of fraud, misconduct, or abuse of discretion. Carolyn asserts, under the Amended Family Trust, Woody has no discretion not to fund her special trust.

■ The court may not substitute its discretion for that of the trustee, and may interfere with the trustee's discretionary powers only in the case of fraud, misconduct, or clear abuse of discretion. *Beaty v. Bales,* 677 S.W.2d 750, 754 (Tex.App.-San Antonio 1984, writ ref'd n.r.e.); *Coffee v. William Marsh Rice Univ.,* 408 S.W.2d 269, 284 (Tex.Civ.App.-Houston 1966, writ ref'd n.r.e.); *see also Brown v. Scherck,* 393 S.W.2d 172, 184 (Tex.Civ.App.-Corpus Christi 1965, no writ) (observing that appellants had not undertaken to allege or prove the trustees had abused their discretion or acted dishonestly, in bad faith or arbitrarily, and a court will not interfere with trustees in the exercise of a discretionary power except where proper

grounds are pleaded and proved). Where the trust instrument is unambiguous and expresses the intentions of the settlor, the trustee's powers are conferred by the instrument and the neither the court nor the trustee can add or take away such power. *Beaty,* 677 S.W.2d at 754.

■ The Amended Family Trust gives the Trustee the discretion to allocate and apportion Trust assets in the distribution of the trust estate. However, Carolyn maintains, upon the death of Mr. Lesikar, the Amended Trust imposes a mandatory duty on the Trustee to divide the trust assets into two special trusts—one for Carolyn and one for Woody. Section 3.6 provides, with respect to the establishment of the special trusts:

All of the remaining trust estate not used to establish the trusts described in Articles 3.1, 3.3, 3.4, and 3.5 above, *shall* be the "Cumulative Total" and *shall* be divided as follows: The Trustee *shall* divide the Cumulative Total in half. One-half (½) *shall* be transferred into a separate trust for WOODY, if living, otherwise it shall be divided into equal parts for his then living descendants, per stirpes. One-half (½) *shall* be transferred into a separate trust for CAROLYN, if living, otherwise it shall be divided into equal parts for her then living descendants, per stirpes. . . . Each trust *shall* be called by the Beneficiary's name with the phrase "Special Trust". Each Beneficiary *shall* be the sole beneficiary of his or her trust. . . . [2]

■ The court interprets trust instruments as it does contracts. *Goldin v. Bartholow,* 166 F.3d 710, 715 (5th Cir.1999). The court's primary objective in construing a will or a trust is to determine the intent of the maker. *Hurley v. Moody Nat'l Bank of Galveston,* 98 S.W.3d 307,

**2.** Emphasis added.

310 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *Myrick v. Moody*, 802 S.W.2d 735, 738 (Tex.App.-Houston [14th Dist.] 1990, writ denied). To determine the maker's intent, we are limited to the four corners of the trust instrument. *Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex.App.-Fort Worth 2003, pet. denied); *Myrick*, 802 S.W.2d at 738. The court should construe the trust to give effect to all provisions so that no provision is rendered meaningless. *Hurley*, 98 S.W.3d at 310; *Myrick*, 802 S.W.2d at 738. The construction of a will or trust instrument is a question of law for the court when there is no ambiguity. *Eckels*, 111 S.W.3d at 694; *Wright v. Greenberg*, 2 S.W.3d 666, 671 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). The parties do not assert on appeal, and they did not assert in the trial court, any ambiguity in the Amended Trust.

 Common words should be given their plain meaning unless the context indicates the words were used in another sense. *Patrick v. Patrick*, 182 S.W.3d 433, 436 (Tex.App.-Austin 2005, no pet.). The word "shall" as used in contracts is generally mandatory, operating to impose a duty. *Roberts v. Clark*, 188 S.W.3d 204, 210 (Tex.App.-Tyler 2002, pet. denied) (citing BLACK'S LAW DICTIONARY 1379 (7th ed.1999)). In common or ordinary parlance, "shall" is a word of "command, and one which has always or must be given a compulsory meaning; as denoting obligation." BLACK'S LAW DICTIONARY 1375 (6th ed.1990). It is "inconsistent with the concept of discretion." *Id.*

Of the remaining assets in the Trust, the Amended Family Trust provided "[o]nehalf (½) *shall* be transferred into a separate trust for CAROLYN, if living, . . ." [3] Under the Trust, Woody had *no discretion*

to do other than fund the special trusts. Because Woody had no discretion not to fund Carolyn's special trust, it was not necessary for the trial court to make of finding of fraud, misconduct, or abuse of discretion. Woody's first issue is overruled.

### WARD TRUST PROVISION

In his fourth issue, Woody asserts the trial court erred in granting partial summary judgment in favor of Carolyn, finding, as a matter of law, that she is the trustee of her special trust.[4] To prevail on a motion for summary judgment, the movant must establish that no material fact issue exists and that she is entitled to judgment as a matter of law. *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex.2005). In conducting our review of the summary judgment, we take as true all evidence favorable to the nonmovant, and make all reasonable inferences in the nonmovant's favor. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex.2005).

 Woody argues it was his obligation under the ward trust provision of the Amended Family Trust not to distribute the assets to Carolyn directly because of a history of instability in her personal life and her inability to manage her financial affairs. The ward trust provision states:

If any share of any trust estate is otherwise provided to be distributed to a person who has not attained the age of eighteen (18) years or *who, regardless of age, in the absolute and uncontrolled judgment of the Trustee, is* insolvent, or incapacitated by reason or legal incapacity or physical or mental illness, or infirmity, o[r] *unable to manage funds* (such

---

3. Emphasis added.

4. Woody does not assert that the trial court erred in denying his counter-motion for interlocutory summary judgment on this issue.

person is referred to as the "WARD") *the Trustee is to hold such share in a separate trust fund for the benefit of such Ward.* When any such Ward attains the age of eighteen (18) years and when such Ward, in the absolute and uncontrolled judgment of the Trustee, becomes legally, financially, mentally, and physically capable of receiving and managing such share, all remaining income shall terminate.... [5]

Carolyn, however, contends, once Mr. Lesikar died, Woody had no discretion but *to recognize her as trustee of her special trust.* Section 8.2 states, in relevant part:

Any Beneficiary of a trust created by Article 3.6 for such Beneficiary after attaining age thirty (30), *shall supersede any then acting Trustee and become sole Trustee of such trust.*[6]

As discussed above, the word "shall" is mandatory[7] and is contrary with the idea of discretion.[8] The Trustee's determination of a beneficiary's ability to manage funds is merely discretionary, while the Amended Family Trust leaves no discretion in Carolyn's being the trustee of her own trust. Allowing the discretionary language of the ward trust provision to trump the mandatory language naming Carolyn the trustee of her own trust would alter the plain language of the Amended Family Trust. It was not error for the trial court to grant Carolyn's motion for partial summary judgment, finding her to be trustee of her special trust. Woody's fourth issue is overruled.

## In Terrorem Clause

In his second issue, Woody contends the trial court erred in awarding relief to Carolyn because her breach of fiduciary claim against him violates the *in terrorem* clause in the Amended Family Trust, resulting in the forfeiture of her interest in the Family Trust. Woody raised the *in terrorem* defense in his motion for interlocutory summary judgment, which Carolyn asserts was filed untimely.[9]

The agreed docket control order set the cut-off date for hearing all dispositive motions on May 27, 2005. The agreed docket control order provided a preferential trial setting of June 6, 2005. Woody filed his motion for interlocutory summary judgment on May 27, 2005. On June 2, 2005, Carolyn filed a motion to strike Woody's motion for interlocutory summary judgment, asserting it was filed less than 21 days before the preferential trial setting and, therefore, it was not possible to meet the 21 days' notice requirement for a hearing on the motion. The trial court did not rule on either Woody's motion for interlocutory summary judgment or Carolyn's motion to strike.

---

5. Emphasis added.

6. Emphasis added.

7. *Roberts*, 188 S.W.3d at 210 (citing BLACK's LAW DICTIONARY 1379).

8. BLACK's LAW DICTIONARY 1375.

9. Woody also raised his *in terrorem* defense in his second supplemental answer, which Carolyn asserts was filed untimely, after the docket control order's cut-off date the for filing amended pleadings. Woody asserts his *in terrorem* defense was properly before the court because Carolyn had already put it in issue by asking the court, in her petition, to construe it. *See Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex.1991) (quoting *Raney v. White*, 267 S.W.2d 199, 200 (Tex. Civ. App.– San Antonio 1954, writ ref'd)) (" 'When a plaintiff in his pleadings anticipates defensive matters and pleads them, a defendant may rely upon the defenses though his only pleading is a general denial.' "). However, as discussed below, Woody's interlocutory motion for summary judgment was not timely filed and Carolyn's breach of fiduciary duty claim did not violate the *in terrorem* clause.

■■■■ Rule 166a(c) provides, in relevant part: "Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be ·filed and served at least *twenty-one days* before the time specified for hearing." TEX.R. CIV. P. 166a(c) (emphasis added). Rule 166a's notice requirements must be strictly construed. *Sams v. N.L. Indus., Inc.*, 735 S.W.2d 486, 487 (Tex.App.-Houston [1st Dist.] 1987, no writ). The reference in Rule 166a(c) to summary judgment hearings in the context of timetables is to provide sufficient notice to the nonmovant to respond to the motion and allow adequate time for the response. *Martin v. Cohen*, 804 S.W.2d 201, 203 (Tex.App.-Houston [14th Dist.] 1991, no writ).

Woody's motion for interlocutory summary judgment was filed ten days before the preferential trial setting. Woody did not request leave to file his motion for summary judgment and there is nothing in the record to show the trial court granted Woody leave. The trial court would not have been able to hold a hearing on Woody's interlocutory motion for summary judgment because Rule 166a(c) requires 21 days' notice for a hearing on a motion for summary judgment. Moreover, had the trial court granted Woody leave to file his motion for interlocutory summary judgment so close to the date of the preferen-tial trial setting, Carolyn would have been entitled to a period of time in which to file a response to Woody's motion. *See Espeche v. Ritzell*, 65 S.W.3d 226, 231 n. 7 (Tex.App.-Houston [14th Dist.] 2001), *rev'd on other grounds*, 87 S.W.3d 536 (Tex. 2002) (observing that had the trial court granted husband leave to file an amended motion for summary judgment so close to the date of the hearing, wife would have been entitled, pursuant to Rule 166a(c), to a period of time in which to file a response to new ground presented in the amended motion); *Sams*, 735 S.W.2d at 488 (holding appellant was deprived of notice and hearing requirements of Rule 166a(c) where reply to appellant's response to motion for summary judgment raising additional grounds for summary judgment was filed after the trial court had heard the motion for summary judgment). We conclude Woody's motion for interlocutory summary judgment was not timely filed and the trial court properly did not consider it.[10]

■■■■ Even if Woody had timely filed his motion for interlocutory summary judgment, we, nonetheless, conclude the *in terrorem* clause does not apply to Carolyn's breach of fiduciary duty claim against Woody related to the sale of certain stock, known as the "Airport Stock," from the Family Trust to him prior to Mr. Lesikar's death.[11] *In terrorem* clauses allow the

---

**10.** Woody contends the trial court considered his *in terrorem* defense by denying his counterclaim on the merits in the final judgment. However, Woody's counterclaim asserts that he alone had authority to apportion and allocate trust assets:

> By way of counterclaim in the event that the Court orders a distribution of the assets of the Family Trust, Defendant seeks as affirmative relief a declaratory judgment that he, and he alone, as Trustee of the Family Trust, has the power to apportion and allocate the real and personal properties of the Family Trust in distribution of the residue of the Family Trust following the death of Woodrow V. Lesikar.

Thus, Woody's *in terrorem* claim was not included in his counterclaim and it does not appear that the trial court considered it. Indeed, with respect to Woody's *in terrorem* defense, the trial court stated, "I think it's too late to raise that issue."

**11.** Carolyn's breach of fiduciary claim against Woody for his purchase of the Airport Stock from the Family Trust is not part of this appeal. In an order dated April 11, 2005, and a nunc pro tunc order dated September 13, 2005, the trial court severed all issues related to the sale of the Airport Stock.

intent of the testator to be given full effect and avoid vexatious litigation, often among members of the same family. *Gunter v. Pogue,* 672 S.W.2d 840, 842–43 (Tex.App.-Corpus Christi 1984, writ ref'd n.r.e.); *see also Ferguson v. Ferguson,* 111 S.W.3d 589, 599 (Tex.App.-Fort Worth 2003, pet. denied) (stating the purpose of the *in terrorem* clause is to dissuade beneficiaries from challenging gifts made in the will). If the intention of a suit is to thwart the settlor's intention, the *in terrorem* clause should be enforced. *Ferguson,* 111 S.W.3d at 599. A violation of the *in terrorem* clause will be found only when the acts of the parties clearly fall within its express terms. *In re Estate of Hamill,* 866 S.W.2d 339, 342–43 (Tex.App.-Amarillo 1993, no writ). Thus, we narrowly construe *in terrorem* clauses to avoid forfeiture while also fulfilling the settlor's intent. *McLendon v. McLendon,* 862 S.W.2d 662, 678 (Tex.App.-Dallas 1993, writ denied).

Section 12.26, the *in terrorem* clause in the Amended Family Trust, states:

It is the Settlor's desire that there shall be not [sic] controversy whatever among the members of his family, or any of them concerning this Trust Agreement or the administration of the trusts created hereunder, and in order, if possible, to prevent such controversy, it is Settlor's will and he hereby expressly provides and makes it a condition precedent to the taking, vesting, receiving or enjoying of any interest in any property or income under or by virtue of the trusts created hereunder that no person or party hereunder shall in any manner contest the trusts created herein or question or contest any provision or recital herein or the operation thereof or any distributions made by the Trustee or any actions taken by the Trustee. Settlor hereby further directs and provides that should any person or party so contest or question, or bring suit, or in any manner whatever directly or indirectly aid in any such contest or questioning, or suit, he or she shall thereupon lose and forfeit all benefits to him or her under the provisions hereof as if the person so contesting or questioning the trust created hereunder or aiding therein had died and such trust of which such person was a beneficiary shall be administered as if such person had died.

Carolyn's claims relate to her allegation that Woody breached his fiduciary duty. "The right to challenge a fiduciary's actions is inherent in the fiduciary/beneficiary relationship." *McLendon,* 862 S.W.2d at 678. Woody argues this clause is broader than the *in terrorem* clause in *McLendon* because it prohibits challenges to any action by the trustee, including whether the trustee breached his fiduciary duty by engaging in self-dealing and, therefore, *McLendon* is inapplicable.[12] We do not read *McLendon* in such a restrictive manner.

Woody further suggests the trial court's granting of his motion for summary judgment on Carolyn's claim for breach of fiduciary duty against him with regard to his purchase of the Airport Stock from the Family Trust demonstrates that she wanted to thwart Mr. Lesikar's intention to sell the stock to Woody while he was still alive. The issue here is whether Carolyn violated the *in terrorem* clause by raising a breach

---

**12.** Woody had previously stated in his response to Carolyn's motion for partial summary judgment that he was *not invoking* the *in terrorem* clause:

[Mr. Lesikar] even provided that if Carolyn (or anyone else) contested the directions he gave in the trust they would forfeit their beneficial interest. Defendant has not attempted to invoke the clause in the Family Trust because he believes Carolyn is entitled to her rightful share.

of fiduciary duty claim against Woody, not whether she prevailed or failed on the merits of that claim. We conclude Carolyn's bringing a breach of fiduciary duty claim against Woody does not violate the *in terrorem* clause and, therefore, does not result in the forfeiture of her share of the Family Trust. Woody's second issue is overruled.

### SPECIAL MASTER'S REPORT

In his third issue, Woody asserts the trial court improperly adopted the special master's report over his objections and denied him a jury trial on the merits. On November 8, 2004, the trial court, on its own motion, appointed a special master, after examining the books and records of the Family Trust and identifying and determining the value of trust assets, to "devise a plan to fairly, equitably, and prudently divide the assets currently held by the Family Trust in accordance with the Amended Family Trust in effect at the time of Mr. Lesikar's death." The special master was further directed to prepare a report to the trial court, which would be provided to the parties at the court's election.

 Carolyn argues Woody has waived any complaint with regard to the trial court's adoption of the special master's report because he failed to object to it before it was adopted. If no proper objection is made to the master's report before the trial court adopts it, the report becomes conclusive on the issues considered by the master. *Owens–Corning Fiberglas Corp. v. Caldwell,* 830 S.W.2d 622, 625 (Tex.App.-Houston [1st Dist.] 1991, orig. proceeding); *Martin v. Martin,* 797 S.W.2d 347, 350 (Tex.App.-Texarkana 1990, no writ); *McCrory & Co. v. Avery Mays Constr. Co.,* 690 S.W.2d 333, 334 (Tex.App.-Dallas 1985, writ ref'd n.r.e.); *Novotny v. Novotny,* 665 S.W.2d 171, 173

(Tex.App.-Houston [1st Dist.] 1983, writ ref'd n.r.e.); *Cameron v. Cameron,* 601 S.W.2d 814, 815 (Tex.Civ.App.-Dallas 1980, no writ). It is the dissatisfied party's burden to make specific objections before the report is adopted by the court. *Martin,* 797 S.W.2d at 350; *McCrory & Co.,* 690 S.W.2d at 334; *Novotny,* 665 S.W.2d at 173; *Cameron,* 601 S.W.2d at 815. To the extent it is challenged by exceptions, the master's report is not binding and the contested fact issues are to be tried de novo before the court if a jury has not been requested, or before a jury if one has been requested. *Minnich v. Jones,* 799 S.W.2d 327, 328 (Tex.App.-Texarkana 1990, orig. proceeding).

In its findings of fact, the trial court states it adopted the special master's report on June 6, 2005, and no objections had been made prior to its adoption. Woody asserts that the trial court adopted the special master's report on June 8, 2005, not June 6, 2005, and he objected to the report before the trial court adopted it. Woody maintains that even if the trial court adopted the special master's report on June 6, 2005, he still objected to it prior to its adoption.

Woody states that at a hearing on April 11, 2005, the trial court was aware that he was "not real happy with that expert report." However, there is nothing in the record showing what specific objections Woody had made to the special master's report at that time. Additionally, the following took place at the April 11, 2005 hearing:

THE COURT: Okay. Let me ask y'all a question at this point. Based on the summary judgment, what action is necessary to get the trust funded?

MR. WAGNER [Carolyn's counsel]: Determine what should go in there.

MS. BAYLESS [Carolyn's counsel]: You have to partition the assets that are

remaining and that's an equitable action. You have to partition those assets that go into the Moon trust and order them distributed to the Moon trust because he's not doing it.

MR. DENMAN [Woody's counsel]: Judge, I don't think that that—I don't think this Court—*it's not equitable* because they're talking about *partitioning real property and that requires appointing of commissioners* and you've got to *go through a valid partition.* This is not something—we're talking about real property, and it's not equitable.

THE COURT: Well, I'm not sure if it's—if the real property—is the title to the real property in the trust?

MR. WAGNER [Carolyn's counsel]: Yes, sir.

MS. BAYLESS [Carolyn's counsel]: Yes. And we're not talking about a partition of a tract of real property. That's what he's talking about.

MR. DENMAN [Woody's counsel]: Well, but, Judge, to determine what assets should go where, I think *you've got to actually partition the real property or be involved with the real property.*

THE COURT: But *you would agree that that's not a jury issue.*

MR. DENMAN [Woody's counsel]: Oh, *we'll argue indefinitely.*

MR. MOORE [Woody's counsel]: Your Honor, there are all sorts of— there is *valuation of properties.* So, all *those are factual issues.* Those are— the trier of facts, whoever it's going to be—and we have a jury in this case— has to decide all those issues. There is no—I know of no legal authority to bifurcate—I mean we don't want two trials of this lawsuit. All these issues are tried together.[13]

Woody argued the valuation of the Trust properties was a fact issue. However, on June 8, 2005, Woody and Carolyn stipulated to values of the Trust properties. With respect to the stipulation, Woody's counsel informed the trial court, "[t]hose [values] will amend the Special Master's report." Woody did not assert the division of the property was a jury issue. To the contrary, Woody agreed the partition of real property is not a jury issue and further argued the partition of real property was not an equitable action for the court, but it would have to be done through the appointment of commissioners.

Next, Woody asserts he objected to the special master's report in his counterclaim, filed on May 27, 2005, in which he sought a declaratory judgment "that he, and he alone, as Trustee of the Family Trust, has the power to apportion and allocate the real and personal properties of the Family Trust in distribution of the residue of Family Trust following the death of Woodrow V. Lesikar." This is not a specific objection to any finding in the special master's report.

Woody further claims he objected, at the June 6, 2005 hearing before the trial court adopted the report, that it would be improper for the court to adopt the special master's division of the trust property because it would interfere with the trustee's discretion. We agree. The following took place at the hearing on June 6, 2005:

THE COURT: Here's what you have got. It hadn't been objected to. The issue is *you have an unobjected Master's report* that specifically reserved, that wouldn't be admissible in evidence at trial, ...

* * *

THE COURT: ... I would say that perhaps a good use of the afternoon

---

13. Emphasis added.

would be, or maybe even the next day for that matter, would be for the Court to hear either argument or maybe limited amount of testimony *before I decide to adopt the report or not.* ... But if the report is approved by the Court then I feel like that the Defendant. . . .

\* \* \*

MR. MOORE [Woody's counsel]: If I may, the Court posed the question whether or not there is a Special Master's report what is the effect. It is our position it does not, for the reason that the case law we presented to the Court says, if the trust document itself provides that upon any distribution, including termination, that *the trustee has the authority to make a partition in cash or in kind, and this trust says that, then the trustee of the trust is the only one that has the authority to make that distribution.*

In the cases that we have cited and Plaintiffs [sic] Counsel cited, *no other cases say the Court has the authority to make an equitable partition only if the trust document doesn't make that provision.*

\* \* \*

MR. DENMAN [Woody's counsel]: Even with the Court's ruling, if there are two trusts from a point in time, again, what we have, we have those two trusts, have divided ownership in the property.

What Mr. Wagner has argued for over four months, and we have asked for authority and they assure it exists and we have not seen it, we couldn't find it in our briefing, is the Court has ruled there are two trusts. *It's now to the trustee to divide the assets between the two trusts.* They can complain about how it's ultimately divided up, but Mr. Wagner keeps referring to equitable powers, and we find no cases. Only case we could find is if the Court looks at it and in those cases, and they do say the reason we're allowing in the Court to terminate the trust and partition the assets is because the trust itself did not provide the mechanism. This trust did not provide for a termination. It just said to split it.

So, what *our position is from the legal standpoint, irregardless what Patrice's report may or may not say, is the Court's power is not to effectuate that report.* But if there is no agreement that the assets would be undivided, the trustee would then at that point in time propose a plan, and if they felt that plan was inequitable they could contest the plan.

THE COURT: Why don't we do this: *Other than the allocation issue whether or not it was bogus, the $200,000, we will call it that, I will adopt for whatever benefit it does the rest of her plan and reserve the right after hearing some testimony and/or argument on the $200,000 issue from both sides.* ... [14]

We agree that Woody objected that the Trustee had the authority to divide Trust assets prior to the trial court's adoption of the special master's report. However, Woody's objections that the Trustee had sole authority to divide Trust assets do not advance his argument that he was denied a jury trial when he did not believe it was an issue for the jury to decide.

Woody further maintains the trial court did not clearly adopt the special master's report at the June 6, 2005 hearing, but, instead, urged the parties to divide the assets by agreement:

14. Emphasis added.

THE COURT: ... What would be wrong with the Court saying, asking you-all, what would be a reasonable time to come up with a proposal and, you know, we informally going off the matrix that Ms. Ferguson put down, or come up with your own and then letting the other side have a period of time to decide. What would be wrong with that?

However, at the June 8 hearing, the trial court stated twice that it had approved the special master's report with the exception of the allocation issue:

MR. MOORE [Woody's counsel]: Your Honor, there is [sic] other deficiencies.

THE COURT: *I have approved the rest of the report.*

MR. MOORE [Woody's counsel]: We understood the Court to say if there were serious problems shown today about the allocation that would open up the entire report.

THE COURT: No. I didn't say that, sir. *I have approved everything except* the portion about—...

On June 8, 2005, prior to the start of the hearing, Woody filed written objections to the special master's report, objecting to the valuations, adjustments, and proposed division of the Trust estate contained in the special master's report. Therefore, according to Woody, because the trial court did not adopt the special master's report until at least June 8, 2005, his objections to the report were timely. To the contrary, as observed above, the trial court stated on June 8 that it had already adopted the master's report in part.

Even if Woody's June 8 objections had been timely, they were not sufficient to preserve error. Woody's objections state, in relevant part:

On March 18, 2005, counsel for Defendant stated in open court at [a] hearing

held in this matter that Defendant questioned the determination and valuations made in the report. Further, at [a] hearing held in this matter on April 11, 2005, counsel for the Defendant reiterated to the Court that fact issues regarding division of the trust estate and valuation of assets were remaining fact issues to be tried. Exhibit A—transcript of April 11, 2005 hearing, page 64.

### III.

Defendant reasserts his objection to the valuations, adjustments and proposed division of the trust estate contained in the Report of the Special Master.

WHEREFORE, Defendant requests that the Court grant Defendant an evidentiary hearing on the contested portions of the Special Master's Report and further that the Court deny division of the trust based upon said Report.

Woody's complaint about the valuations of the Trust property was resolved when he entered into a stipulation regarding those valuations. Woody's complaint about the division of the Trust estate is a general, not specific, objection, and, moreover, the special master's report is not included in the appellate record so we do not know what the objectionable recommended division was. With regard to Woody's reference to the April 11, 2005 hearing, Woody did not object to the proposed division in the special master's report at that hearing, but, instead, agreed it was not a jury issue. Additionally, with regard to Woody's reference to a hearing that took place on March 18, 2005, we do not have a record of that hearing and cannot review what his objections may have been.

We conclude the record supports the trial court's finding that it adopted the special master's report on June 6, 2005,

and Woody's June 8 objections to the report were not timely. Appellant's third issue is overruled.

## ATTORNEY FEES

In his fifth issue, Woody claims the evidence is legally insufficient to support the trial court's finding that $400,000 was a reasonable and necessary attorney fee under Section 37.009 of the Texas Civil Practice and Remedies Code ("Declaratory Judgments Act") [15] and Section 114.064 of the Texas Property Code.[16] In its findings of fact, the trial court found a reasonable, necessary, and customary fee for Carolyn's attorneys is $400,000. In its conclusions of law, the trial court determined Carolyn is entitled to recover attorney fees under the Declaratory Judgments Act and the Texas Property Code.

 The grant or denial of attorney fees under both the Declaratory Judgments Act and the Property Code lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing it abused that discretion. *Oake v. Collin County,* 692 S.W.2d 454, 455 (Tex.1985); *Lyco Acquisition 1984 Ltd. P'ship v. First Nat'l Bank of Amarillo,* 860 S.W.2d 117, 121 (Tex. App.-Amarillo 1993, writ denied). The trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 161 (Tex.2004). There is no abuse, however, simply because a trial court may decide a matter within its discretion differently than an appellate court. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985).

██ Under an abuse of discretion standard, legal and factual sufficiency of the evidence are relevant factors in assessing whether the trial court abused its discretion. *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991). We review the trial court's findings of fact for legal and factual sufficiency of the evidence by the same standards applied in reviewing the evidence supporting a jury's finding. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 827. The evidence is legally sufficient if it would enable fair-minded people to reach the verdict under review. *Id.*

 Under both the Declaratory Judgments Act and the Texas Property Code, the trial court may award reasonable and necessary attorney fees as are equitable and just. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; TEX. PROP.CODE ANN. § 114.064. Whether attorney fees are reasonable and necessary are fact questions to be determined by the fact finder. *Ridge Oil Co. v. Guinn Invs., Inc.,* 148 S.W.3d 143, 161 (Tex.2004); *Hachar v. Hachar,* 153 S.W.3d 138, 142 (Tex.App.-San Antonio 2004, no pet.). Whether attorney fees are equitable and just are questions of law for the court to decide. *Ridge Oil Co.,* 148 S.W.3d at 161; *Hachar,* 153 S.W.3d at 142. "Unreasonable fees cannot be awarded, even if the court believed them just, but the court may conclude that it is not equitable or just to

---

**15.** TEX. CIV. PRAC. & REM CODE ANN. § 37.009 (Vernon 1997).

**16.** TEX. PROP.CODE ANN. § 114.064 (Vernon 2007).

award even reasonable and necessary fees." *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex.1998); *Hachar*, 153 S.W.3d at 142.

██ The Texas Supreme Court has set forth eight factors for determining the reasonableness and necessity for attorney fees: (1) the time and labor involved, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997).

Woody stipulated to the qualifications of Carolyn's attorneys, Bobbie Bayless, Brett Wagner, and Vaughn Stewart. Bayless, whose practice has always been "commercial/civil litigation," has been licensed since 1980, and is board certified in civil trial law. Bayless has practiced in Brazoria County in cases other than this case and believes she has sufficient familiarity with rates charged in Brazoria County to provide this testimony. Bayless stated her hourly rate is $300, which she opined is a reasonably hourly rate based on her years' of practice and qualifications in Harris and Brazoria Counties. She did not think the hourly rate is significantly different between Harris and Brazoria Counties. Bayless did not know Wagner's or Stewart's hourly rates, but opined that $300 is also a reasonable hourly rate for both Wagner and Stewart.

██ Bayless testified she, Wagner, and Stewart spent a total of 2,500 hours on this case. Based on an hourly fee of $300 for each of three attorneys for 2,500 spent on this case, the total fee would be $750,000. However, Bayless opined a reasonable fee would be $500,000. Bayless further reduced that amount to $400,000 (based on 1,333 hours) by excluding time spent on the proceedings involving Carolyn's challenge to the sale of the Airport Stock to Woody. Bayless testified she has a 40% contingency fee contract with Carolyn. It is estimated Carolyn's half the of the residue of the Family Trust is $1,000,000, resulting in a $400,000 fee to Carolyn's attorneys under the contingency fee contract. Bayless, however, explained she was testifying about a reasonable fee.[17]

Bayless stated she has kept only some time records in this case, but she did not produce them at trial, and she was not aware of Wagner's or Stewart's having kept time records. In spite of there being no time records, Bayless explained her belief that at least 2,500 hours have been spent on this case is based on her familiarity with the case and the work that has been done. She estimated Stewart's and Wagner's time spent on the case from the work she knows they have done and from her experience knowing the amount of work necessary to a case.

Bayless was not able break down in detail how much time was spent attending

---

17. A party's contingent fee contract alone cannot support an award of attorney fees, but, instead, is a factor to be considered by the fact finder. *Arthur Andersen & Co.*, 945 S.W.2d at 818. A party must prove the amount of fees incurred was both reasonable and necessary to the prosecution of the case. *Id.* at 818–19.

each hearing or preparing each pleading, but, instead, she broke down the hours Carolyn's attorneys spent on larger aspects of the case. Bayless testified that when Carolyn came to her, there had been a proceeding in Harris County in which Woody had asserted Carolyn had violated the no-contest clause by seeking an accounting. Bayless stated there were 100 hours of pre-suit investigation regarding Carolyn's request for an accounting, which had been requested, but not given. Between 50 and 75 hours were expended on determining causes of action and remedies, drafting initial pleadings, and attending a TRO hearing. Carolyn's attorneys spent at least 200 hours on discovery requests, hearings on discovery requests, and requests for living expenses for Carolyn. Bayless stated she spent at least 350 hours going through documents produced by Woody and follow-up with Woody's attorneys about what documents had been requested, but were not among the documents produced to Carolyn. Bayless testified 350 hours were spent on research and preparation of Carolyn's motion for summary judgment on the trustee issue and the hearing on the that motion. Bayless further stated between 50 and 75 hours were spent on meeting with the special master and gathering and providing documents to the special master, and between 100 and 150 hours, including performing research and attending hearings, were expended on the case after the special master had filed her report. Finally, the total amount of time spent for preparation for trial and attending seven days of trial was 600 hours.

The trial court observed that, according to Bayless' testimony, the total amount of time expended by Carolyn's attorneys was "closer to 2,000" hours, rather than the initial 2,500–hour figure. However, Bayless had already agreed to reduce the amount of time on which she based their request for attorney fees to about 1,300 hours.

One of Woody's trial attorneys, William Denman, testified in his opinion, real estate, probate, and trust litigators do not charge more than $250 an hour in Brazoria County. Denman also opined it is not reasonable for three lawyers to charge a total of $900 an hour to prepare and present this case at trial; instead, a case this size would require two attorneys at a total of $500 an hour. Time records reflect that Woody's attorneys have spent 700 hours on this case. Denman testified it is unusual to have plaintiff's counsel spend more hours on a case than defense counsel. It was stipulated that Woody's attorney fees were $153,000. Denman also stated the only novel issue of law was related to the *in terrorem* clause, while the other issues were standard real estate and trust issues.

Carolyn asserts a trial court does not abuse its discretion when the attorney testifies that the fees incurred were reasonable and necessary and summarizes the hours and rate charged. In support of this proposition, Carolyn relies on *London v. London*, in which we stated, "[t]here is no abuse of discretion where an award of attorney fees is supported by the evidence," and the cases cited in that same footnote. 94 S.W.3d 139, 147 n. 3 (Tex. App.-Houston [14th Dist.] 2002, no pet). Carolyn's reliance on *London* is misplaced. The cases cited in *London* involved attorney fee awards that were supported by time records or testimony as to specific hours expended.[18]

---

18. *See, e.g., Farish v. Farish*, 921 S.W.2d 538, 546 (Tex.App.-Beaumont 1996, no writ) (finding *stipulation* by appellant's counsel as to appellee's qualifications and *reasonableness of* *hourly fee* and appellee's submission to trial court of *itemized statements* sufficient to support award of attorney fees); *Thomas v. Thomas*, 895 S.W.2d 895, 898 (Tex.App.-Waco

Here, Bayless had no knowledge of Wagner's or Stewart's hourly rates. Although Woody stipulated to Wagner's and Stewart's qualifications, Bayless did not testify as to their experience justifying the $300 hourly rate for each of them. Bayless kept some time records, but she did not bring them to the trial. She was not aware of any time records kept by Wagner or Stewart. Bayless gave rough estimates of the amount of time spent by her, Wagner, and Stewart on general, but not specific, aspects of the case.

█ Carolyn further claims the trial court knew the amount of work the case required. However, the trial court may not take judicial notice of the attorney fees under section 37.009. *See Dickey v. McComb Dev. Co.,* 115 S.W.3d 42, 46 (Tex. App.-San Antonio 2003, no pet.) (holding that when a claim for fees does not fall under Section 38.001 of the Texas Civil Practice and Remedies Codes, the trial court may not take judicial notice of attorney fees).

█ Moreover, while Bayless testified she was segregating the amount of time spent on the challenge to the sale of the Airport Stock to Woody, she provided no testimony that she was segregating time spent on Carolyn's other tort claims, i.e., breach of fiduciary duty (not related to sale of Airport Stock), negligence, interference with inheritance, conversion, and civil conspiracy, which she nonsuited and for which attorney fees may not be recovered,[19] from the trustee issue. When the plaintiff seeks to recover attorney fees in a case involving multiple claims, at least one of which supports an award of fees and at least one of which does not, the plaintiff must offer evidence segregating attorney fees among various claims. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10–11 (Tex.1991), *holding modified by Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299 (Tex.2006). There is an exception to the segregation rule: "when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa,* 212 S.W.3d at 313–14. Carolyn offered no evidence that segregation was not necessary. Woody's fifth issue is sustained.

█ An award of attorney fees based on unsegregated fees requires a remand. *Chapa,* 212 S.W.3d at 314; *Stewart Title Guar. Co.,* 822 S.W.2d at 11. We reverse that portion of the judgment awarding

1995, writ denied) (finding no abuse of discretion in award of attorney fees based on attorney's testimony regarding *specific number of hours spent* on motion to modify child support order and hourly rate charged); *Cohen v. Sims,* 830 S.W.2d 285, 290 (Tex. App–Houston [14th Dist.] 1992, writ denied) (finding award of attorney fees was not abuse of discretion where attorney testified as to usual and customary fees charged in modification action, *specific number of hours expended,* and hourly rate); *Coke v. Coke,* 802 S.W.2d 270, 278 (Tex.App.-Dallas 1990, writ denied) (finding testimony of attorney's qualifications, number of hours expended, hourly rate, and *summary of services rendered* sufficient to support award of attorney fees); *MacCallum v. MacCallum,* 801 S.W.2d 579, 587 (Tex.App.-Corpus Christi 1990, writ denied) (finding evidence supporting attorney fees was *specific,* including testimony regarding experience and hourly rate, and testimony that services were related to hearing and necessary to case); *Laviage v. Laviage,* 647 S.W.2d 758, 761 (Tex. App.-Tyler 1983, no writ) (finding evidence of counsel's hourly rate, credentials, and expertise in family law, and *records kept, prepared, and processed* supported award of attorney fees).

19. *See Metropolitan Life Ins. Co. v. Haney,* 987 S.W.2d 236, 243–44 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (stating attorney fees are not recoverable on tort claims); *Villasenor v. Villasenor,* 911 S.W.2d 411, 420 (Tex. App.-San Antonio 1995, no writ) (same).

Carolyn attorney fees and remand it to the trial court for proceedings consistent with this opinion. The remainder of the judgment is affirmed.

Accordingly, the judgment of the trial court is affirmed, in part, and reversed and remanded, in part.