# NO. 12-17-00234-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DEBORAH PATTERSON HOWARD GOUGHNOUR, APPELLANT* | *§* | *APPEAL FROM THE 241ST* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *ROBERT H. PATTERSON, JR., TRUSTEE OF THE DEBORAH PATTERSON HOWARD TRUST, APPELLEE* | *§* | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

We deny Appellant Deborah Patterson Howard Goughnour's motion for rehearing. On the court's own motion, we withdraw our opinion issued on December 21, 2018 and vacate our judgment of that date. The following is now the opinion of this court.

Deborah Patterson Howard Goughnour appeals from an adverse judgment rendered in favor of Robert H. Patterson, Jr., Trustee of the Deborah Patterson Howard Trust. In forty-two issues, Deborah raises complaints regarding discovery rulings, Robert's affirmative defenses to her counterclaims, sufficiency of the evidence to show that Robert properly administered the Trust, conditional provisions in the judgment, attorney's fees, and a discovery abuse sanctions order. We modify in part and affirm as modified.

### BACKGROUND

Robert Harold Patterson, Sr. provided for the creation of a Trust for the benefit of his wife, Ruth, upon his death. Ruth served as the Trustee until 2002, when, by judicial modification, she resigned, and the Trust was divided into four trusts of equal value, named after each of their four

1

children.[1] Ruth is the sole beneficiary during her lifetime, and upon Ruth's death any remaining assets in the four trusts pass to the trust's namesake.

In 2002, Robert Patterson, Jr. became Trustee of all four trusts. With the knowledge of Ruth and his three siblings, Robert invested Trust assets to generate income. In July 2007, Robert and his business partner Dean Bailey formed Bighorn Venture III, Ltd. to purchase real estate and develop a residential subdivision. Robert invited Ruth and his siblings to participate by allowing the use of Trust funds. They all agreed, and Robert transferred a total of $2.1 million from the four trusts to Bighorn. The Bighorn project failed, and the Trust lost the $2.1 million.

In 2011, Robert filed a petition for resignation as Trustee of the Deborah Patterson Howard Trust (DPH Trust), approval of accountings, judicial discharge, and appointment of a Successor Trustee. Deborah did not oppose Robert's resignation as Trustee. However, she filed counterclaims against Robert for breach of fiduciary duty, statutory violations, misuse of trust property, and fraud. She also asserted allegations against Robert and Bailey for civil conspiracy to breach fiduciary duty, civil conspiracy to commit fraud, breach of a personal guaranty, and breach of contract. Robert and Bailey asserted numerous affirmative defenses to the counterclaims.

Deborah sought an interlocutory order to remove Robert as Trustee immediately which was denied in March 2013. Deborah filed a motion for partial summary judgment regarding Robert's claim for a discharge from liability and a motion for summary judgment on her claims for breach of fiduciary duty and breach of guaranty. In his response, Robert asserted several affirmative defenses. The trial court denied both motions in August 2015. Additionally, Robert filed no evidence and traditional motions for partial summary judgment on Deborah's guaranty claim and a traditional motion for partial summary judgment attacking her other claims, asserting his affirmative defenses. The trial court granted all three of Robert's motions for partial summary judgment in December 2015.[2]

---

[1] Throughout this opinion, our reference to the "Trust" encompasses all four trusts collectively, and, at times, only Deborah's Trust, which is also referred to at times as the DPH Trust.

[2] The orders granting Robert's motions on the guaranty claim specifically decreed that Deborah take nothing on all her claims against any party. The order granting Robert's motion on Deborah's other claims decrees that Deborah take nothing on all her claims against Robert and Bailey. Our record does not include a motion for summary judgment filed by Bailey. However, Bailey is not a party to this appeal.

After a trial before the court on the remaining issues, the court rendered judgment approving the DPH Trust accounting, ordered that Robert's administration of the DPH Trust is approved, and that Robert, individually and in his capacity of Trustee, is "completely discharged and relieved of all duties" and "fully and completely released and discharged from any and all claims, duties, causes of action or liabilities (including taxes of any kind) relating to any and all actions or omissions in connection with his administration of the DPH Trust." The court ordered that the Trustee or Successor Trustee pay all outstanding legal and accounting fees incurred by the DPH Trust, appointed a Successor Trustee effective as of the date the final judgment becomes final and unappealable, and relieved the Successor Trustee of any and all duty, responsibility, or authority to investigate the actions or inactions of Robert as prior Trustee. The court further ordered that Deborah take nothing on all her claims against Robert and Bailey, incorporating its prior summary judgment orders. The court also ordered Deborah to pay attorneys' fees for Robert and Ruth. This appeal ensued.

## DEBORAH'S COUNTERCLAIMS

Deborah was in favor of Robert's resignation. She felt that he pilfered the Trust for his own benefit and engaged in subterfuge to keep it hidden. In an attempt to recover the money she believed Robert misappropriated, she filed counterclaims for breach of fiduciary duty, fraud, breach of a guaranty, exposure to tax liability, and, together with Bailey, conspiracy to breach fiduciary duty and to commit fraud. All of Deborah's counterclaims were disposed of by summary judgment.

### Standard of Review

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n,* 253 S.W.3d 184, 192 (Tex. 2007). After adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. TEX. R. CIV. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged element. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). A no evidence challenge will be sustained when, among other scenarios, there is a complete absence of evidence of a vital fact. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

3

A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). A defendant who conclusively negates at least one of the essential elements of the cause of action or conclusively establishes an affirmative defense is entitled to summary judgment. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant establishes his right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 439 S.W.3d 571, 575 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

To determine if there is a fact issue, we review the evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could do so, and disregarding contrary evidence and inferences unless reasonable jurors could not. *Gonzalez v. Ramirez*, 463 S.W.3d 499, 504 (Tex. 2015) (per curiam); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). More than a scintilla of evidence exists, and the evidence raises a genuine issue of fact, when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions in light of all the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam); *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact. *Forbes, Inc.*, 124 S.W.3d at 172.

When a party has moved for summary judgment on both traditional and no evidence grounds, we typically first review the propriety of the summary judgment under the no evidence standard. *See* TEX. R. CIV. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). When both sides move for summary judgment and the trial court grants one motion but denies the other, the appellate court should review both sides' proof and determine all questions presented by the motions. *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 153-54 (Tex. 2010) (per curiam). The appellate court should then render the judgment the trial court should have rendered. *Id*. at 154. However, the denial of a cross-motion for summary judgment is only reviewable if that cross-motion sought a disposition of all claims in the trial court. *See In re D.W.G.*, 391 S.W.3d 154, 164 (Tex. App.−San Antonio 2012, no pet.).

**Breach of Fiduciary Duty and Fraud**

In her thirteenth issue, Deborah contends the trial court erred in granting Robert's motion for partial summary judgment on her counterclaims,[3] which was based on several affirmative defenses. In her eighth, ninth, and tenth issues, she contends the trial court erred in denying her second motion for partial summary judgment which addressed her claims for breach of fiduciary duty and, alternatively, her claim that Robert breached his personal guaranty. In this motion, she also asserted that Robert's affirmative defenses have no merit.

### *Statute of Limitations*

A suit for breach of fiduciary duty or fraud must be brought no later than four years from the date the cause of action accrues. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a) (West 2002). When a cause of action accrues is a question of law. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990). A cause of action accrues when facts have come into existence that authorize a claimant to seek a judicial remedy. *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 120 (Tex. 2001). Defendants seeking summary judgment on the basis of limitations must prove when the cause of action accrued. *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990). In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003).

When applicable, the discovery rule defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). The discovery rule applies to claims for breach of fiduciary duty. *See HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 888 (Tex. 1998). Likewise, fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015). A person to whom a fiduciary duty is owed is relieved of the responsibility of diligent inquiry into the fiduciary's conduct, so long as the relationship exists. *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex. 1996). However, once the fact of misconduct becomes apparent it can no longer be ignored, regardless of the nature of the relationship. *Id*.

---

[3] Robert's motion addressed Deborah's claims for breach of fiduciary duty and fraud. Deborah's claims for common law fraud and constructive fraud were made in the alternative and based on the same facts as her breach of fiduciary duty claims, Robert's representations and omissions of material facts relating to the Bighorn transaction. In her brief, in arguing against the trial court's ruling on this motion, Deborah refers only to her breach of fiduciary duty claims. Therefore, it appears that she is not challenging the ruling as to her fraud claims. To the extent she is challenging that ruling, the challenge meets the same fate as her challenge to the ruling on the fiduciary duty claims.

In his motion for partial summary judgment, Robert asserted that Deborah's claims for breach of fiduciary duty and fraud are barred by the statute of limitations. Contending that her claims accrued on August 30, 2007, the day the Bighorn investment was made, he argues that her July 30, 2012 counterclaims were not timely filed.

In her response, Deborah argued that "the earliest she had any inkling that Robert was up to something nefarious was in 2009" when her request for an accounting was met with a demand that she release him from past acts. Her argument continued with, "[a]t best, Deborah's claims accrued in 2011, when Robert first disclosed that her trust had no ownership interest in Bighorn or its real property . . . ." Deborah rebuffs Robert's assertion that the injury Deborah complains of occurred when Robert invested Trust assets in Bighorn. Although she admits "[i]t is true that Deborah's claims for Robert's breach of his fiduciary duty and fraud arise out of the Bighorn transaction," she lists ten specific acts and omissions that form the basis of her complaints. Among these are her complaints about the structure of the Trust's involvement in the Bighorn transaction and Robert's lies and omissions about the details of the transaction. She argues that Robert has the burden to show that she had sufficient knowledge of these acts or omissions before July 2008, four years prior to the date she filed her counterclaim.

On July 20, 2007, Robert sent an email to his mother and three sisters entitled "Investment Opportunity." He explained that he formed a real estate company with Dean Bailey and briefly described their plan to develop residential lots and sell them to builders, stating that they are currently working on two projects, Bighorn Venture III and Lucas Farms. He stated that he was considering placing the Trust into these deals and described a potential scenario for their participation. Saying they would use approximately $750,000 of the Trust's line of credit, he called it an equity investment with a preferred return of approximately 13.25%, that would receive 1.25% of the equity profits generated. He specifically asked if the email recipients wanted "to make an investment like in this venture." He asked for a yes or no answer and stated that if they did not want their Trust invested, he would honor their wishes.

Robert's three sisters, including Deborah, and Ruth agreed to his proposal. Robert transferred Trust assets to Bighorn on August 30, 2007. He sent a Trust update email on October 3, 2007, stating that all four trusts are invested in Bighorn Venture III. He said the trusts are guaranteed a minimum of a 15% internal rate of return and can possibly go as high as a 20% rate

6

of return. He stated that three trusts invested $600,000 each while one of the sisters' trust invested $323,600.

In an April 27, 2008 email, Robert reiterated the Bighorn report that he sent in October. He also reported that one of the builders was interested in buying a larger percentage of the development. In a September 10, 2008 email, regarding Bighorn, Robert reported that they refinanced the debt on the Trust loans and were attempting to delay bringing new lots online in 2009. He noted that "softness is still prevalent in the DFW market" and that, due to the state of the housing recovery, 2010 is a better time to bring those lots online. He stated that one of the builders withdrew its commitment to the project.

In her deposition testimony, Ruth explained that Deborah was angry at Robert in December 2008 because of the Bighorn project. She also stated that Deborah asked Robert to resign from her trust "way back."

In a May 14, 2009 email, Robert reported that they delayed bringing new lots online since one builder declared bankruptcy and the other advised that they will not currently accept new lots. He said they were working with the bank to restructure the loan. He stated, "[t]here is much uncertainty about the viability of the housing market and so we are working with the bank and our other lenders to determine how to handle this project."

His January 5, 2010 email was even more grim. He explained that in October 2008, they determined that they needed to delay the project and went to their bank and asked to renegotiate the terms. The bank stonewalled them and they ceased construction. Efforts to deal with the bank failed, the loan matured in August 2009, and in October they received a foreclosure notice. They placed Bighorn into Chapter 11 bankruptcy. He closed by saying, "[t]his is a very difficult situation but we have a possibility although slight to reorganize and return a part or all of the Trust Investment. It depends on how receptive the bankruptcy judge may be."

In his March 28, 2011 email, Robert announced that the property involved in the Bighorn Venture was foreclosed by the bank on April 5, 2010. He also stated that the Trust lost all investments. He explained that the Trust has no further liability because the Trust loaned money to Bighorn for a preferred returns interest but did not guarantee any debt. He clarified that the Trust is no longer involved in Bighorn Venture III, there are no assets in Bighorn, only debt, and there is no possibility of recovery of the Trust's investment.

In response to the March 28 email, Deborah asked, on March 30, who owns the property Bighorn purchased. Robert replied, explaining that the bank foreclosed on April 5, 2010, and Bighorn, which is defunct and owns no assets, owes the bank $5.1 million and filed for bankruptcy.

The Bighorn transaction occurred on August 30, 2007. To be timely, Deborah's claims for breach of fiduciary duty and fraud, which are based on that transaction, should have been filed by August 30, 2011. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a). The evidence shows that, by August 30, 2011, Deborah knew that the structure of the transaction that occurred was not the one Robert described in July 2007; the housing market was struggling; one of the Bighorn builders withdrew from the project and the other stopped accepting new lots; by mid-August 2009 they ceased construction, the bank started foreclosure proceedings, and Bighorn filed for bankruptcy; and by March 2011, all of the Trust's investments were lost with no possibility of recovery of that money. In his March 28, 2011 email, Robert stated that the Trust loaned money to Bighorn for a preferred returns interest.

The emails Robert sent contained sufficient facts giving rise to her causes of action. Additionally, by the end of 2008, Deborah was angry with Robert because of the Bighorn project, and she had already asked Robert to resign from her trust before that date. We disagree with Deborah's assertion that some of her allegations constitute breaches of fiduciary duty separate from the Bighorn transaction. Her allegations that Robert lied about the transaction, failed to provide pertinent information about the transaction, and structured the transaction differently than described in his initial email are all facets of the allegation that Robert breached his fiduciary duty by misusing Trust assets for the Bighorn project. Therefore, these allegations share the same accrual date, August 30, 2007. We conclude that the statute of limitations ran on Deborah's breach of fiduciary duty and fraud claims on August 30, 2011. The trial court did not err in granting Robert's motion for summary judgment on these claims.

In her seventh counterclaim, Deborah asserted that Robert breached the statutory prudent investor standard by failing to invest and manage the Trust's assets as a prudent investor would. *See* TEX. PROP. CODE ANN. §§ 117.003-.004 (West 2014). A claim that the Trustee violated the statutory standard of care equates to a claim for breach of fiduciary duty. Thus, the four year limitations period applies to this claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a). Summary judgment on this claim was proper.

In her tenth counterclaim, Deborah asserted that Robert's misuse of Trust assets constituted defalcation. Defalcation is defined as the fraudulent misappropriation of money held in trust; financial wrongdoing involving a breach of trust; or the failure to meet an obligation; a nonfraudulent default. *Defalcation*, BLACK'S LAW DICTIONARY (10th ed. 2014). This claim is merely a restatement of her breach of fiduciary duty and fraud claims. Thus, the four year statute of limitations applies to this claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a). Summary judgment on this claim was also proper.

### Quasi-Estoppel

The affirmative defense of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position she has previously taken. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). The doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which she acquired or by which that party accepted a benefit. *Nash v. Beckett*, 365 S.W.3d 131, 144 (Tex. App.−Texarkana 2012, pet. denied).

The record shows that Robert initiated approximately fifty real estate transactions in which he invested Trust assets. Deborah agreed to all of these transactions. All transactions except Bighorn were successful and the Trust benefitted from those prior investments. Therefore, Deborah's claims for breach of fiduciary duty are barred by the affirmative defense of quasi-estoppel. *See id*.

### Terms of Trust Instrument

Generally, subject to the Trustee's duty to act in good faith and in accordance with the purposes of the Trust, the terms of the Trust prevail over provisions of the Texas Trust Code. TEX. PROP. CODE ANN. § 111.0035(b)(4)(B) (West Supp. 2018). A term of a Trust exculpates a Trustee from liability if the Trustee's breach of trust is not committed in bad faith, intentionally, or with reckless indifference to the interest of a beneficiary. TEX. PROP. CODE ANN. § 114.007(a) (West 2014).

Paragraph C(5) of the Trust provided that the Trustee shall not "at any time be held liable for any action or default of himself or his agent or of any other person in connection with the administration of the trust estate, unless caused by his own gross negligence or by a willful commission by him of an act in breach of trust." Such an exculpatory clause has been held

9

effective in exonerating a trustee from liability for losses when no evidence of gross negligence was shown. *See* **Tex. Commerce Bank, N.A. v. Grizzle**, 96 S.W.3d 240, 251 (Tex. 2002).

To prove gross negligence, a plaintiff must show (1) an act or omission that, when viewed objectively from the defendant's standpoint at the time it occurred, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) that the defendant had an actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of others. TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West Supp. 2018). Under the first element, an "extreme risk is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff." **Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue**, 271 S.W.3d 238, 248 (Tex. 2008). To determine if acts or omissions involve extreme risk, we analyze the events and circumstances from the defendant's perspective at the time the harm occurred, without resorting to hindsight. *Id*. Under the second element, "actual, subjective awareness" means that "the defendant knew about the peril, but its acts or omissions demonstrated that it did not care." **Mobil Oil Corp. v. Ellender**, 968 S.W.2d 917, 921 (Tex. 1998). Circumstantial evidence is sufficient to prove either element. *Id*.

Robert testified that he thought he should make the Trust available to have investments. He invested Trust funds for many years, making as many as fifty deals. All those investments were successful except Bighorn. He gave his mother and siblings the option to participate. When structuring the Bighorn deal, he tried to get the Trust the best rate of return. He did not want the Trusts to be guarantors of debt. Robert personally guaranteed the bank debt and the debt to the previous owner of the land. At the time, he was very comfortable with the investment and would not have "done the deal" if he thought it would result in a large judgment against him. He opined that, in 2007, no one could predict the 2008 financial crisis.

Robert explained his due diligence in connection with the Bighorn transaction. He and his partner, Bailey, did two other similar transactions and it appeared this was a good business to be in. They hired a consulting firm to do a market analysis and feasibility study, including a determination of the time frame for selling off all the lots. They talked to multiple home builders, "getting their input on what they thought the market was going to be, what their demands were." They talked to banks about borrowing ten to twelve million dollars. A bank ordered an appraisal of the land they wanted to purchase. The bank agreed to loan the money and Robert and Bailey

10

contracted with two reputable builders who took all of the lots over a sixty month basis. They looked at "mezzanine financing to put the extra layer of equity . . . ." Robert decided the Trust should be involved in the mezzanine financing. Based on their research, Robert and Bailey felt it was a good investment and their partnership expected a three million dollar profit. Robert testified that they knew what the equity would be, and the risk of profit was on them as the developer. According to Robert's projections, in a three year period, the Trust would have received about $3.5 million, including the return of the principal. Deborah's trust would have received close to one million dollars of that amount.

The evidence shows that Robert had experience in real estate transactions, hired professional consultants, and researched home builders and financing options. Robert obtained the commitment of experienced home builders and bankers. He structured the Trust's role in a manner that did not require it to guarantee any debt to a bank and, if the transaction had been successful, would have resulted in a high profit for the Trust. When viewed objectively from his standpoint, at the time they occurred, his acts did not involve an extreme degree of risk, considering the probability and magnitude of the potential harm to the Trust. Thus, the evidence does not support the objective component of the gross negligence analysis. *See Hogue*, 271 S.W.3d at 248.

Robert is also a beneficiary of the Trust and his Trust also contributed $600,000 to Bighorn funding, which he lost. Additionally, his company, Bighorn Ventures, invested in the project and did not survive, and Robert made personal guaranties to creditors to consummate the deal. There is no evidence that Robert had an actual, subjective awareness of the risk of a coming financial crisis but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of the Trust, his mother, or his sisters. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11)(B). Thus, there is no evidence of gross negligence or a willful commission by Robert of a breach of trust. We conclude that Robert showed as a matter of law that Deborah's claims were barred by the Trust instrument's exculpatory clause. *See Grizzle*, 96 S.W.3d at 251.

Because Robert asserted valid affirmative defenses to Deborah's breach of fiduciary duty and fraud claims, the trial court did not err in granting Robert's partial motion for summary judgment on those claims. *See Fernandez*, 315 S.W.3d at 508. We overrule Deborah's thirteenth issue.

### *Deborah's Second Motion for Partial Summary Judgment*

Deborah's second motion for partial summary judgment, which addressed her claims for breach of fiduciary duty, did not seek judgment on all claims before the trial court, therefore its denial is not reviewable. *See In re D.W.G.*, 391 S.W.3d at 164. We do not reach Deborah's eighth, ninth, and tenth issues in which she complains of the trial court's denial of her second motion for partial summary judgment.

**Guaranty**

In her eleventh and twelfth issues, Deborah asserts that the trial court erred in granting Robert's no evidence and traditional motions for partial summary judgment on her guaranty claim. In his no evidence motion for summary judgment, Robert argued that "Deborah can present no evidence sufficient to raise a genuine issue of material fact as to any element of her claim that a guaranty exists pursuant to which Robert has guaranteed payment of a debt to the Trust."

"Guaranty" means an agreement under which a person assumes, guarantees, or otherwise becomes primarily or contingently liable for the payment or performance of an obligation of another person. TEX. FIN. CODE ANN. § 306.001(6)(A) (West 2016). The agreement must be in writing, signed by the person to be charged with the promise or by someone authorized to sign for him, be complete in every material detail, and contain all essential elements of the agreement. TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(2) (West 2009); *Cohen v. McCutchin,* 565 S.W.2d 230, 232 (Tex. 1978). The essential terms of a guaranty agreement are (1) the parties involved, (2) a manifestation of intent to guaranty the obligation, and (3) a description of the obligation being guaranteed. *Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 261 (Tex. App.−Houston [14th Dist.] 2003, pet. denied).

In his July 20, 2007 email explaining the proposed Bighorn arrangement, Robert included the statement: "Also Robert Patterson and Dean Bailey would guarantee the $750,000 personally secured by their interest in BHV III." On August 31, 2007, Bailey, on behalf of Bighorn, and Robert, as guarantor, signed a document entitled "Memorandum of Agreement, Bighorn Ventures III, Ltd. and Regina Patterson Edwards Trust, Robert H. Patterson, Jr. Trust, Deborah Patterson Howard Trust, and Deanne Patterson Brown Trust." It specified the business terms of the agreement between Bighorn and the four trusts. Pertinent to this discussion, it provided as follows:

> 2) The Trusts investments of $2,123,600 will be guaranteed by Robert H. Patterson, Jr.
> 3) The proposed yield to the Trust is 15.0% preferred return over the life of the investment. This yield shall accrue and shall be payable only when there are net

> proceeds available to be distributed to the sponsors. Distributions to the Trusts will go first to pay any accrued but unpaid interest on the unpaid investment amount and second to repay the investment amount.

The July 2007 email is insufficient to meet the definition of guaranty. It speaks in terms of a future offer and did not fully describe the obligation being guaranteed. However, the August 2007 memorandum identifies the parties, the obligation of the four trusts to invest $2,123,600, and Robert's intent to guaranty that obligation. Reviewing the evidence in the light most favorable to Deborah, we conclude that the evidence is sufficient to show that "a guaranty exists pursuant to which Robert has guaranteed payment of a debt to the Trust." *See id*. Accordingly, the trial court erred in granting Robert's no evidence motion for partial summary judgment on Deborah's guaranty claim. *See* TEX. R. CIV. P. 166a(i). But as we explain next, this error was rendered harmless by the trial court's ruling on Robert's traditional motion for partial summary judgment on Deborah's guaranty claim.

In his traditional motion for partial summary judgment on Deborah's guaranty claim, Robert argues in part that Deborah cannot recover on the guaranty because there is no principal obligation to which a guaranty may attach. We agree.

To recover under a guaranty agreement, a party must show proof of (1) the existence and ownership of the guaranty contract, (2) the performance of the terms of the underlying contract by the holder, (3) the occurrence of the conditions upon which liability is based, and (4) the failure or refusal to perform the promise by the guarantor. *Rainier Income Fund I, Ltd. v. Gans*, 501 S.W.3d 617, 622 (Tex. App.–Dallas 2016, pet. denied).

Pursuant to the Memorandum of Agreement, the Trust supplied equity funding for the Bighorn development as part of a financing scheme that included two loans to other parties that, unlike the Trust's equity funding, were secured by the subject property. The terms of the agreement were both overtly benevolent and covertly unfavorable to the Trust.

The Trust was to have priority distribution, a 15% preferred return over the life of the investment, and, if all the property sold within the first eighteen months, it would have received an additional 5% yield. But these savory terms were all provisional, dependent on the financial health of the Bighorn project. Distribution was of net proceeds, payable only when there were net proceeds available. And that 5% bonus yield was to be paid "to the point that the net proceeds to the [project] sponsors would fund that amount . . . ." The agreement defined "net proceeds" as

13

any proceeds from the sale of the subject property after deduction for required debt payments plus legal and other typical costs of the sales transaction. In other words, after all other expenses were paid, if there was any money left over, it would be applied to fulfill these promises to the Trust. Further, any distributions would be applied first to interest and second to repay the investment amount.

Inserted in the middle of the business terms of the agreement between Bighorn and the Trust is the declaration that Robert will guarantee the Trust's investment of $2,123,600. Taken as a whole, the agreement makes it clear that the Trust will not be entitled to repayment unless the Bighorn project generated net proceeds. There was not an absolute agreement to repay the $2,123,600.

The evidence is undisputed that the Bighorn development ended with the property being foreclosed on and Bighorn filing for bankruptcy. There were never any net proceeds available to be distributed. Therefore, the evidence proves as a matter of law that the condition upon which liability is based never occurred, and there is no obligation to which a guaranty can attach. *See id*. Thus, Robert proved entitlement to judgment as a matter of law on Deborah's guaranty claim. The trial court did not err in granting Robert's traditional motion for partial summary judgment on that claim. *See Fernandez*, 315 S.W.3d at 508.

Which brings us back to the court's ruling on Robert's no evidence motion for partial summary judgment on the guaranty claim. The harmless error rule states that before reversing a judgment because of an error of law, the reviewing court must find that the error amounted to such a denial of the appellant's rights as was reasonably calculated to cause and probably did cause the rendition of an improper judgment, or that the error probably prevented the appellant from properly presenting the case on appeal. TEX. R. APP. P. 44.1; *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011). The rule applies to all errors. *G & H Towing Co.*, 347 S.W.3d at 297.

The trial court's erroneous determination that no guaranty existed is rendered harmless by the trial court's determination that Deborah cannot recover under that guaranty. *See* TEX. R. APP. P. 44.1(a). We overrule Deborah's eleventh and twelfth issues.

**Statutory Fraud and Exposure to Tax Liability**

By her fourteenth, fifteenth, and sixteenth issues, Deborah asserts that the trial court erred when granting Robert's no evidence motion for partial summary judgment and both of his traditional motions for partial summary judgment by ruling that she take nothing on all of her

claims. She argues that his motions did not address her claims for exposure to tax liability and violation of statutory securities regulations.

Robert filed his three motions on September 29, 2015. Deborah added her claims for violation of statutory securities regulation and breach of fiduciary duty based on exposure to potential tax liability in her Fourth Amended Petition which she filed on November 12, 2015. She correctly asserts that Robert did not address these claims in his motions for partial summary judgment.

A summary judgment cannot be granted on the entirety of an opponent's case unless the motion addresses each of the nonmovant's causes of action. *Chessher v. Sw. Bell Tel. Co.*, 658 S.W.2d 563, 564 (Tex. 1983) (per curiam). If, after a motion for summary judgment is filed, the nonmovant amends her petition to allege new causes of action, the movant must ordinarily amend his motion to address the new causes of action. *Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 791 (Tex. App.−Dallas 2002, pet. denied). It is generally reversible error for a trial court to render summary judgment on a claim not addressed in the summary judgment motion. *Wilson v. Davis*, 305 S.W.3d 57, 73 (Tex. App.−Houston [1st Dist.] 2009, no pet.). There is, however, a limited exception to the general rule. *Id*. The exception applies when (1) the movant conclusively proved or disproved a matter, usually corresponding to a claim's element or to an affirmative defense, that would also preclude the unaddressed claim as a matter of law or (2) the unaddressed claim is derivative of the addressed claim, and the movant proved its entitlement to summary judgment on that addressed claim. *Id*.

In her eighth counterclaim, which Deborah entitled "Breach of Fiduciary Duty, Exposure to Extreme Tax Liability," she incorporated by reference the factual allegations contained in the preceding paragraph and pleaded this claim in the alternative. She asserted that Robert claimed a $600,000 short term capital loss for a bad business debt on the Trust's 2010 federal income tax return and that he testified that this reflected a write off of the loan from the Trust to Bighorn. Arguing that Robert's current claim that the transfer was a purchase transaction involving the sale of an equity interest is at odds with the tax return, she asserted that Robert has exposed the Trust to potential damage.

As explained above, the Trust instrument contains an exculpatory clause which exonerates Robert from liability when there is no evidence of gross negligence. *See Grizzle*, 96 S.W.3d at 251. Because the Trust's participation in the Bighorn transaction resulted in a loss to the Trust,

15

Robert reported that loss on the Trust's 2010 income tax return and claimed a deduction. As shown above, there is no evidence that Robert's use of the Trust's funds in furtherance of that transaction constituted gross negligence. Likewise, his characterization of the loss on the 2010 tax return does not constitute gross negligence. Accordingly, the exoneration clause of the Trust instrument exonerates Robert from liability for breach of fiduciary duty, if any, in exposing the Trust to potential tax liability. Because the affirmative defense asserted in Robert's motion for partial summary judgment also encompasses this claim for breach of fiduciary duty, any error in granting the motion on this claim is harmless. *See* **G & H Towing Co.**, 347 S.W.3d at 297-98; **Wilson**, 305 S.W.3d at 73.

In her ninth counterclaim, Deborah asserted that Robert initially represented that he would sell the Trust an equity interest in Bighorn, the Trust did not receive an equity interest, and Robert later characterized the use of the Trust's money as a loan. She argued that this constitutes a violation of the Texas Securities Act, citing Article 581-33A(2). *See* TEX. REV. CIV. STAT. ANN. art. 581-33 (West 2010).

In her Fourth Amended Counterclaim, Deborah stated that, in March 2011, Robert disclosed that the Trust received no ownership interest in Bighorn or the real property it purchased. Her securities act claim was first asserted in her Fourth Amended Counterclaim, which was filed on November 12, 2015. The statute provides that no person may sue under Section 33A(2) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence, or more than five years after the sale. *Id*. art. 581-33H(2)(a)-(b). Deborah asserted her claim more than four years after she discovered the facts on which her claim is based and more than eight years after the transaction that is the basis of her claim.

As explained above, Robert asserted limitations as an affirmative defense against Deborah's claims. Because a ground asserted in his motion for partial summary judgment encompasses Deborah's claim for violation of the Texas Securities Act, this claim is precluded as a matter of law. **G & H Towing, Co.**, 347 S.W.3d at 297-98. Therefore, the trial court's granting of Robert's motions on all of Deborah's claims, including the unaddressed claim for violation of the securities act, is harmless. *Id*. We overrule Deborah's issues fourteen, fifteen, and sixteen.

### REQUEST FOR REMOVAL OF TRUSTEE

16

In issues one through four, Deborah contends the trial court abused its discretion by refusing to remove Robert as Trustee and appointing a Successor Trustee in February 2013. She argues that Robert should be removed because he breached the Trust agreement, the property code, and his fiduciary duty.

The property code authorizes removal of a trustee, after a hearing, for certain numerated reasons. *See* TEX. PROP. CODE ANN. § 113.082 (West 2014). Deborah presented her removal request to the trial court, the court held an evidentiary hearing, and it denied her request. However, in the final judgment, the court ordered that Robert "is fully and completely discharged and relieved of all duties, responsibilities and further obligations with respect to the administration of the DPH Trust . . . ." The court further ordered that Texas Private Trust will be appointed as Successor Trustee.

Appellate courts are prohibited from deciding moot controversies. *See Camarena v. Tex. Emp't Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). An issue becomes moot if there ceases to be an actual controversy between the parties. *See Strange v. HRsmart, Inc.*, 400 S.W.3d 125, 132 (Tex. App.–Dallas 2013, no pet.). Denial of Deborah's interim request to remove Robert as Trustee became moot when the trial court ordered his removal in the final judgment. We do not reach Deborah's first, second, third, or fourth issues.

## REQUEST FOR ADMISSIONS

In her fifth and sixth issues, Deborah contends the trial court abused its discretion by failing to overrule Robert's objections to her requests for admissions and by refusing to declare that Robert admitted each of Deborah's requests for admissions. She argues that Robert's objections were prohibited "prophylactic" objections which the trial court was obligated to overrule.

Deborah submitted requests for admissions to Robert, asking him to admit or deny 257 statements. Robert objected to each statement. Deborah moved to strike Robert's objections and compel responses to her requests. A hearing was held on Robert's motions for partial summary judgment at which Deborah's request to present her motion to strike was denied. Robert's motions for partial summary judgment were granted and, thereafter, the court determined that Deborah's motion to strike objections and compel responses became moot when Robert's motions were granted.

17

The primary purpose of requests for admission is to simplify trials by eliminating matters about which there is no real controversy. *Boulet v. State*, 189 S.W.3d 833, 838 (Tex. App.–Houston [1st Dist.] 2006, no pet.). When the trial court granted Robert's motions for partial summary judgment on all of Deborah's claims against him, there was no need for admissions to simplify the case. As we explained, the trial court correctly found in favor of Robert on Deborah's counterclaims. Deborah makes no attempt to explain how the trial court's determination that her motion to strike was moot probably caused the rendition of an improper judgment or probably prevented her from properly presenting her case in this court. *See* TEX. R. APP. P. 44.1(a). We overrule Deborah's fifth and sixth issues.

## TRUSTEE'S PERFORMANCE AND LIABILITY

In her issues seventeen and twenty through twenty-two, Deborah asserts that there is insufficient evidence to support the trial court's determination that Robert properly administered and managed the DPH Trust, properly performed his duties and responsibilities as Trustee, furnished the beneficiaries with full and complete accountings, or that Robert's administration should be approved.

In Deborah's eighteenth, nineteenth, and twenty-third issues, she contends the trial court abused its discretion by discharging Robert from liability involving any and all actions or omissions relating to his administration of the DPH Trust. She argues that neither approval of a final accounting nor declaratory judgment actions adjudicate potential tort liability.

Whether a Trustee's resignation should be accepted is within the discretion of the trial court. *See McCormick v. Hines*, 498 S.W.2d 58, 63 (Tex. Civ. App.–Amarillo 1973, writ dism'd). The trust code and the language of the trust instrument determine the Trustee's powers and duties. *See* TEX. PROP. CODE ANN. §§ 113.002, 113.051 (West 2014); *Corpus Christi Bank & Trust v. Roberts*, 597 S.W.2d 752, 753 (Tex. 1980). The trust code requires that a written statement of accounts shall show (1) all trust property that has come to the trustee's knowledge or into the trustee's possession, (2) a complete account of receipts, disbursements, and other transactions regarding the trust property, (3) a listing of all property being administered, with a description of each asset, (4) the cash balance on hand with the name and location of the depository where the balance is kept, and (5) all known liabilities owed by the trust. TEX. PROP. CODE ANN. § 113.152 (West 2014).

18

The Trust instrument was designed to provide for Ruth's support, and Robert was required to make distributions to her during her lifetime. To that end, Robert was authorized to hold assets, make investments, manage securities, operate, sell, or liquidate the Trust's business interests, sell, lease, or develop Trust property, manage, control, improve, and repair Trust property, borrow money for any Trust purpose, commence or defend litigation affecting the Trust or its property, and pay taxes and expenses of the Trust.

A trial before the court was held on May 30, 2017. The Trust's accountant testified that the accounting reflects the receipts, disbursements, payment of expenses, distributions, transfers, land sales, and all financial transactions that occurred in the DPH Trust. He stated that the accounting fully and fairly discloses all financial matters relating to the administration of the Trust from 2002 through 2016.

Robert testified regarding the documents that he provided to Deborah showing all financial transactions involved in the administration of the Trust. He presented monthly statements itemizing investment accounts, including their gains, losses, and values, as reported by UBS Financial Services, Inc., for 2002 through 2016 and showing the cash balance on hand. He also presented spreadsheets showing receipts and disbursements from the DPH Trust from 2002 through 2016, documents showing cash available to the DPH Trust, as well as income tax returns for the DPH Trust for 2002 through 2015. The record also contains closing statements relating to the sale of real estate.

Robert testified that each of the four trusts started with $115,000 in 1989. Since 2002, when he became Trustee, till the time of trial, he paid Ruth close to a million dollars. He estimated that the value of the DPH Trust at the time of trial was $1.2 or $1.3 million. The record shows that all investments Robert made on behalf of the Trust, with the exception of the Bighorn investment, were profitable. Additionally, Robert sent emails to Ruth and his siblings describing the current financial picture of the Trust and updating them on Trust activities. Based on the evidence presented at the hearing on Robert's petition for resignation, we conclude the trial court did not abuse its discretion by determining that Robert properly administered the Trust and properly performed his duties, including providing the beneficiaries with a complete accounting, and the court properly approved Robert's administration. *See **Roberts***, 597 S.W.2d at 753. We overrule Deborah's issues seventeen and twenty through twenty-two.

19

In the final judgment, the court ordered that Robert is fully and completely released and discharged from any and all claims, duties, causes of action or liabilities relating to any and all actions or omissions in connection with his administration of the DPH Trust. Deborah complains that this order constitutes an abuse of discretion. She states that approving a final accounting does not adjudicate a trustee's "potential tort liability" and that a trustee cannot use a declaratory judgment action to determine "potential tort liability." The court's order does not include this phrase, and she does not explain how the order addresses "potential tort liability." We conclude that it does not.

A judgment is construed in the same manner as other written instruments, and it is construed as written. *See Ellis v. Mortgage and Trust, Inc.*, 751 S.W.2d 721, 723 (Tex. App.−Fort Worth 1988, no pet.). If the decree taken as a whole is unambiguous, the court is required to declare the effect of the decree in light of the literal meaning of the language used. *Wilde v. Murchie*, 949 S.W.2d 331, 332-33 (Tex. 1997) (per curiam).

In response to Robert's petition for resignation as Trustee, Deborah filed counterclaims alleging various theories of liability. Those counterclaims were disposed of by partial summary judgments prior to the trial before the court at which the issues of the accounting and Robert's discharge were heard. The final judgment incorporated the prior summary judgments, specifically ordering that Deborah take nothing on all her claims against Robert. *See City of Beaumont v. Guillory*, 751 S.W.2d 491, 492 (Tex. 1988) (per curiam) (holding that partial summary judgments merge in final judgment disposing of all parties and issues). Considering the literal meaning of the language used, we conclude that the final judgment's reference to a release of liability contemplates the previously determined counterclaims, not "potential tort liability." *See id*. As previously explained, the trial court's rulings on Deborah's counterclaims were proper. Therefore, the trial court did not abuse its discretion by releasing Robert from liability for his actions or omissions in connection with his administration of the Trust. We overrule Deborah's issues eighteen, nineteen, and twenty-three.[4]

## CONDITIONAL PROVISIONS IN JUDGMENT

---

[4] In her seventh issue, Deborah asserts that the trial court erred by denying her first motion for partial summary judgment. In that motion, she sought to dispose of Robert's request for a judicial release and discharge as Trustee. We do not reach this issue because it is based on review of the denial of a motion that did not seek a final judgment. S*ee In re D.W.G.*, 391 S.W.3d at 164.

In her twenty-fourth and twenty-fifth issues, Deborah asserts the trial court erred in finding that Robert tendered his resignation as Trustee contingent upon a non-appealable judgment and by ordering that the appointment of the Successor Trustee would be effective on the date the final judgment becomes unappealable. She argues that Robert did not plead that his resignation should be subject to a non-appealable judgment. She further argues that there is no evidence that conditioning his resignation on an unappealable judgment is necessary to protect the rights of other interested persons.

In her twenty-sixth issue, Deborah complains of the provision of the judgment relieving the Successor Trustee of any and all duty, responsibility, or authority to investigate the actions or inactions of Robert as Trustee. She argues that Robert made no such request in his pleadings, there was no evidence, or insufficient evidence, or law, to support an implied finding that the ruling would ensure the safety of the trust fund, and the ruling was an abuse of discretion.

The trial court may accept a Trustee's resignation and discharge the Trustee from the Trust on the terms and conditions necessary to protect the rights of other interested parties. TEX. PROP. CODE ANN. § 113.081 (West 2014). Acceptance of the Trustee's resignation is within the trial court's discretion. *McCormick v. Hines*, 498 S.W.2d 58, 63 (Tex. Civ. App.−Amarillo 1973, writ dism'd). Consideration must be given to the interests of parties to be affected. *Id*. The trial court has the discretion to alter the rights, powers, and authority of the successor trustee. TEX. PROP. CODE ANN. § 113.084 (West 2014).

Deborah's complaints arise from the following portion of the judgment:

> IT IS FURTHER ORDERED that, effective as of the date that this Final Judgment becomes final and appealable, Texas Private Trust is appointed as the sole Successor Trustee of the DPH Trust, and that Texas Private Trust or any other Successor Trustee is relieved of any and all duty, responsibility or authority to investigate the actions or inactions of Robert H. Patterson, Jr. as the prior Trustee of the DPH Trust.

Deborah asserts that conditioning appointment of the Successor Trustee on an unappealable judgment is error because Robert failed to include that request in his pleadings. We acknowledge that a judgment must conform to the pleadings. *See* TEX. R. CIV. P. 301. Robert requested the court allow him to resign as Trustee and appoint a successor. That is what this judgment does. Deborah complains of the timing of the requested relief. Timing is not a separate cause of action or issue. It is a factor within the discretion of the trial court.

21

Apparently, Deborah prefers the court appoint the Successor Trustee upon approval of the accounting, that is, immediately, and not at some point in the future. Even assuming there is nothing in the record on which the trial court could base a determination that delaying appointment of the Successor Trustee is necessary to protect the rights of some interested person, Deborah must identify the harm done by postponing the appointment. *See G & H Towing Co.*, 347 S.W.3d at 297. She did not articulate any argument explaining how she was harmed. From her stance in the trial court, we know that she believes Robert will continue to pay his legal fees out of the Trust as long as he is Trustee. As we explain below, we conclude that Robert cannot look to Deborah for payment of his attorney's fees. Deborah has not shown any harm, or reversible error, caused by the trial court's order to appoint the Successor Trustee after the judgment becomes final and appealable. *See id.*

In three sentences, with no citation to authority, Deborah complains that the judgment improperly shields Robert from investigation by the Successor Trustee. Again, she complains that Robert did not include this request for relief in his petition. Assuming he was required to, and assuming the record supports the trial court's determination that it is appropriate to include this limitation on the Successor Trustee, Deborah has not shown how this provision harms her. She brought numerous claims against Robert, without success. Subject to the potential application of the doctrine of res judicata, this judgment does not restrict her, or anyone other than the Successor Trustee, from investigating Robert's actions further and pursuing litigation if warranted. Because Deborah has shown no harm caused by the provision in the judgment insuring that Robert will not be investigated by the Successor Trustee, she has not shown reversible error. *See id.* We overrule Deborah's issues twenty-four, twenty-five, and twenty-six.

### ATTORNEY'S FEES-JUST AND EQUITABLE

In her twenty-seventh issue, Deborah asserts the trial court abused its discretion in ordering her to reimburse the Trust in the amount of $587,585 for Robert's attorney's fees. She argues that the evidence is legally and factually insufficient to support a finding that it is just and equitable for her to reimburse the Trust for fees Robert incurred defending himself against her counterclaims. She also asserts that it is just and equitable that Robert reimburse the Trust for the Trust funds Robert used to pay his attorney's fees. In her thirtieth issue, Deborah asserts it is not just and equitable for her to reimburse Ruth for attorney's fees Ruth incurred in connection with Deborah's

22

counterclaims against Robert. She further argues the trial court abused its discretion by ordering Deborah to reimburse the Trust $53,791 for Ruth's attorney's fees.

In her twenty-eighth and twenty-ninth issues, Deborah contends that it is not just and equitable for her to reimburse Robert for attorney's fees he might incur in connection with an appeal to the court of appeals or the Texas Supreme Court, and the trial court abused its discretion in ordering her to do so. In her thirty-first and thirty-second issues, Deborah asserts the evidence is insufficient to support a finding that it is just and equitable for her to reimburse Ruth's attorney's fees on appeal to the court of appeals and the Texas Supreme Court, and the trial court abused its discretion in ordering her to do so.

**Applicable Law**

An award of reasonable and necessary attorney's fees that are "equitable and just" is allowed under the Uniform Declaratory Judgments Act and the Texas Trust Code. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2015); TEX. PROP. CODE ANN. § 114.064 (West 2014). Whether an award of attorney's fees is equitable and just are matters of law addressed to the trial court's discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). That determination depends on the concept of fairness in light of all the surrounding circumstances. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 162 (Tex. 2004). The party asserting the inequity of an attorney's fee award is not required to present distinct evidence on that question of law. *In re Estate of Kuykendall*, 206 S.W.3d 766, 772 (Tex. App.−Texarkana 2006, no pet.). The court may conclude that it is not equitable or just to award even reasonable and necessary fees. *Bocquet*, 972 S.W.2d at 21. In applying the Declaratory Judgments Act or trust code Section 114.064, the conclusion that an award of fees is equitable and just is not dependent on a finding that a party "substantially prevailed." *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996); *Hachar v. Hachar*, 153 S.W.3d 138, 142 (Tex. App.−San Antonio 2004, no pet.).

The trial court's determination to award attorney's fees is reviewed for an abuse of discretion. *See Bocquet*, 972 S.W.2d at 22; *Hachar*, 153 S.W.3d at 142; *see also In re Ford Motor Co.*, 988 S.W.2d 714, 721 (Tex. 1998) (orig. proceeding) (held that trial court's award of appellate attorney's fees is reviewed for abuse of discretion). Under an abuse of discretion standard of

23

review, we review the entire record. *See **Kirkland v. Schaff***, 391 S.W.3d 649, 655 (Tex. App.–Dallas 2013, no pet.). If there is some evidence in the record that shows the trial court followed guiding rules and principles, then the reviewing court may not find an abuse of discretion. ***Bocquet***, 972 S.W.2d at 22-23 (Baker, J., dissenting). Trial judges, as well as appellate judges, can draw on their common knowledge and experience as lawyers and judges in considering the testimony, the record, and the amount in controversy in determining attorney's fees. *See **id**.* at 22 (Baker, J., dissenting).

**Analysis**

In considering the question of whether Deborah should reimburse the Trust, we consider provisions of the Trust instrument and circumstances surrounding the fee requests when made. The Trust instrument authorized payment of litigation expenses out of Trust funds for any litigation that affected the Trust. However, the Trust instrument did not speak to the question of what is or is not equitable.

The record shows that there was discord between Robert and Deborah since at least 2007. Deborah asked Robert to resign as Trustee. He offered to resign only if Deborah would provide him with a release of liability which Deborah refused to provide.

Robert petitioned the court for approval of his resignation as Trustee in 2011. In that petition, he asked the court to render judgment approving the accounting and "releasing and fully and completely discharging [Robert] from any and all claims, duties and liabilities regarding the Trust and/or his administration of the Trust, . . ." and directing that all costs, expenses and attorney's fees and accounting fees incurred by Robert in connection with his petition be paid out of the assets of the Trust. In her original answer, Deborah asked only for an accounting. A year after Robert filed his original petition, Deborah filed an amended answer that first included her counterclaims. In November 2015, Robert filed his first amended petition in which he stated that he sought a declaratory judgment approving the Trust accountings and releasing and discharging him, as Trustee and individually, from any liability involving matters relating to his administration of the Trust.

While acknowledging that Deborah was not required to give him a release, Robert testified that there would have been no litigation if she had provided the release. Robert's attorney testified that Robert would agree to resign if they designated a Successor Trustee and if Deborah agreed to fully release Robert. At the same time, Robert complains that the litigation drained the Trust. His

actions show that he deemed it more important to obtain the release than to preserve his mother's funds. He asked the court to order Deborah to reimburse the Trust with $587,585 that was used to pay his attorneys and accountants for fees for services rendered to defend against the counterclaims. Robert's attorney testified that Robert was not asking Deborah to pay for amounts predating the lawsuit or for the accounting. In argument to the court, he made it clear that Robert wanted the court to order Deborah to reimburse the Trust for fees that were incurred to defend against her counterclaims. The judgment provides in pertinent part:

> IT IS FURTHER ORDERED that the Trustee, on behalf of the Trust, shall recover from Deborah the sum of $587,585.00 as reasonable attorney's fees and expenses incurred by the Trustee related to Deborah's claims through the trial of this case. In the event of an appeal by Deborah or any Respondent (other than Mrs. Harris) to the Court of Appeals, if the appeal is unsuccessful, the Trustee will be further entitled to recover from Deborah an additional sum of $70,000.00 as reasonable attorney's fees and expenses. In the event that Deborah or any Respondent (other than Mrs. Harris) files a Petition for Review in the Texas Supreme Court, if the appeal is unsuccessful, the Trustee will be further entitled to recover from Deborah an additional sum of $25,000. In the event the Texas Supreme Court grants a Petition for Review and the Trustee prevails, then the Trustee will be further entitled to recover from Deborah an additional sum of $50,000.

> IT IS FURTHER ORDERED that Mrs. Harris shall have and recover judgment from and against Deborah in the sum of $53,791.00, as reasonable attorney's fees and expenses incurred by Mrs. Harris through the trial of this case. In the event of an appeal by Deborah or any Respondent (other than Mrs. Harris) to the Court of Appeals, if the appeal is unsuccessful, Mrs. Harris will be further entitled to recover from Deborah an additional sum of $30,000.00 as reasonable attorney's fees and expenses. In the event that Deborah or any Respondent (other than Mrs. Harris) files a Petition for Review in the Texas Supreme Court, Mrs. Harris will be further entitled to recover from Deborah an additional sum of $15,000.00.

The record shows that Robert repeatedly engaged in self-dealing. In the summer of 2007, he told the Trust beneficiaries that, with their permission, he would invest approximately $750,000 of Trust money in a project planned by his real estate company. After getting the approval of the beneficiaries, he did not follow through on those terms. Instead, he loaned $2.1 million in Trust funds to an entity he was part owner in and lost all of that money when the deal collapsed. His actions resulted in a material financial loss to the Trust.

It is settled law that a trustee is not entitled to expenses related to litigation resulting from the fault of the trustee. *See duPont v. S. Nat'l Bank*, 575 F.Supp. 849, 864 (S.D. Tex. 1983),

*modified*, 771 F.2d 874 (5th Cir. 1985). Here, although Deborah asserted that Robert engaged in wrongdoing, there was no trial on Deborah's breach of fiduciary duty and fraud claims. Robert won on those counterclaims, not after a review of the merits, but based solely on his affirmative defenses presented by way of summary judgment motion. Through affirmative defenses the defendant seeks to establish a reason why the plaintiff should not recover independent from an examination of the merits of her claims. *Hamm v. Millennium Income Fund, L.L.C.*, 178 S.W.3d 256, 268 (Tex. App.−Houston [1st Dist.] 2005, pet. denied). If true, the defendant's affirmative defense will defeat the plaintiff's claim, even if all the allegations in the complaint are true. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 155-56 (Tex. 2015). That Deborah's counterclaims are barred by limitations, quasi-estoppel, and the Trust instrument's exculpatory clause is a factor we consider in looking at the equities in this case. For purposes of our discussion, a win on affirmative defenses is not on equal footing with a win on the merits. Moreover, neither the Declaratory Judgments Act nor trust code Section 114.064 are prevailing party statutes, and an award of attorney's fees under those statutes is not dependent on a finding that a party substantially prevailed. *Hachar*, 153 S.W.3d at 142; *City of Willow Park v. Bryant*, 763 S.W.2d 506, 511 (Tex. App.−Fort Worth 1988, no writ). It follows that Robert's win does not require a determination that an award of attorney's fees is equitable.

We acknowledge that the judgment orders "that the Trustee has properly performed his duties and responsibilities as the Trustee of the DPH Trust." This language is found in the sentence discharging Robert from the duties of Trustee. This can only refer to Robert's actions that were proven at trial which did not include his defenses against Deborah's counterclaims, the rationale for the award of $587,585.

Robert complains that Deborah was the only one to contest his actions and her counterclaims cost the Trust an enormous amount of money, depleting the liquid assets to the point that the Trust cannot pay its share of Ruth's mandatory distributions. He argues that this causes Ruth to bear the burden of the cost of this litigation. Therefore, he argues, Deborah should reimburse the Trust. We disagree. Robert and Ruth treated the four trusts as belonging to the remainder beneficiaries by naming the trusts after them, getting their permission to use funds for investments, and by making distributions to the remainder beneficiaries during Ruth's lifetime. Robert engaged in very risky activities and lost a substantial amount of Trust money. Deborah had the right to disagree with and question Robert's actions, and her claims were against him

26

individually, alleging inappropriate actions. Robert did not have the right to insist on a release from Deborah. Robert was not cleared of any wrongdoing by a review of the merits. Considering all of the circumstances, we conclude that it was inequitable as a matter of law for the trial court to order Deborah to pay Robert's $587,585 attorney's fee bill for his defense of her counterclaims. *See Bocquet*, 972 S.W.2d at 21. We sustain the portion of Deborah's twenty-seventh issue in which she complains of the trial court's order for her to pay $587,585 to Robert on behalf of the Trust.

Next, we address Deborah's argument that Robert should reimburse the DPH Trust for funds he previously took for payment of his attorney's fees. She argues that "it is just and equitable that Robert reimburse the Trust for the benefit he received breaching his fiduciary duty – payment of his attorney's fees from the Trust corpus." Although she includes this argument in her discussion under her twenty-seventh issue in which she complains of the trial court's order for her to reimburse the Trust for Robert's attorney's fees, it is an unrelated issue. This complaint is not governed by trust code Section 114.064 which addresses the equitable award of attorney's fees. *See* TEX. PROP. CODE ANN. § 114.064.

Disgorgement is an equitable forfeiture of benefits wrongfully obtained. *In re Longview Energy Co.*, 464 S.W.3d 353, 361 (Tex. 2015). Courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010). The remedy discourages disloyalty and strengthens fiduciary relationships by stripping the defendant of a wrongful gain. *In re Longview Energy Co.*, 464 S.W.3d at 361. Whether a forfeiture should be imposed must be determined by the trial court based on the equity of the circumstances. *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999). The remedy of forfeiture is only available for "clear and serious" violations of fiduciary duty. *Id*. at 241. We review the trial court's fee forfeiture determination for an abuse of discretion. *Id*. at 243.

In her 2015 petition, Deborah requested disgorgement of money Robert took from the DPH Trust to pay his attorneys fees incurred in defending against Deborah's counterclaims. Disgorgement is an equitable remedy available to plaintiffs who prove a defendant is guilty of clear and serious violations of fiduciary duty. *See id*. at 241. Here, Deborah did not obtain a fact finding that Robert violated a fiduciary duty. *See id*. at 245-46. Therefore, the trial court did not abuse its discretion by determining that Deborah was not entitled to the equitable remedy of

disgorgement. We overrule Deborah's twenty-seventh issue to the extent she complains of the trial court's failure to order disgorgement.

We next consider Deborah's complaint that she must repay Ruth's attorney's fees. Robert named Ruth as a party in his petition, and she entered an appearance in the case as an interested party. Without elaboration, her attorney testified that her appearance was necessitated by the claims asserted by Deborah. Ruth is the Trust beneficiary and the Trust funds belong to her. No claims were filed by or against Ruth. She is essentially an observer. However, she hired an attorney who charged her a total of $53,791.50 for reviewing documents, participating in conferences, and attending hearings and a deposition between August 2012 and May 2017.

Ruth did not want Robert to resign as Trustee, she had no complaints about his actions as Trustee, and she did not want Deborah to sue Robert. She testified that she wanted to protect Robert because Deborah was angry about the Bighorn investment. There is no indication in the record that Ruth objected to payment by the Trust of attorney's fees incurred by Robert in defending against the counterclaims by which Deborah sought to impose personal liability on Robert. Her attorney testified that Ruth paid her attorney's fees personally and argued that it would be just and equitable for the court to order Deborah to pay Ruth's attorney's fees. As explained above, it was not equitable for Robert to be reimbursed for his attorney's fees. Ruth aligned herself with Robert and played no discernable part in the conflict between Robert and Deborah. Under these circumstances, we conclude that it was not equitable to award attorney's fees to Ruth, and the trial court abused its discretion in ordering Deborah to pay Ruth $53,791 in attorney's fees.[5] *See Bocquet*, 972 S.W.2d at 21. We sustain Deborah's thirtieth issue.

Deborah also asserts that the trial court abused its discretion by ordering her to reimburse Robert and Ruth for attorney's fees that they might incur on appeal to this court and the supreme court because the evidence is insufficient to show reimbursement is just and equitable. We agree. The bulk of the appeal involves issues concerning the counterclaims. Deborah never contested the accounting or Robert's removal as Trustee. Other than the award of attorney's fees to Ruth, neither the judgment nor Deborah's complaints about it directly concern Ruth. The rationale that caused us to conclude it was not equitable to order Deborah to reimburse Robert and Ruth for attorney's fees incurred through trial is equally applicable to the order for Deborah to pay their appellate

_____

[5] The Trust, as amended, requires discretionary distributions to Ruth to be made equally from the four trusts. Therefore, if Ruth is to be reimbursed, the Trust instrument forbids full payment from Deborah's Trust.

attorney's fees. The trial court abused its discretion in ordering that Robert is entitled to $70,000 in attorney's fees for an unsuccessful appeal to the court of appeals, $25,000 if Deborah files an unsuccessful petition in the supreme court, and an additional $50,000 if that petition is granted. Likewise, the trial court abused its discretion in ordering that Ruth is entitled to recover from Deborah $30,000 in attorney's fees in the event of an unsuccessful appeal to the court of appeals and $15,000 if Deborah files a petition for review in the Texas Supreme Court. *See id*. We sustain Deborah's issues twenty-eight, twenty-nine, thirty-one and thirty-two.

## ATTORNEY'S FEES-OUTSTANDING FEES

In her thirty-third issue, Deborah asserts that the evidence is legally and factually insufficient to support the trial court's implied findings that Robert had additional legal fees or expenses outstanding, or that those fees were reasonable and necessary. She further asserts that the trial court abused its discretion by ordering that the Trust should pay Robert's outstanding legal fees.

Deborah apparently refers to the part of the trial court's order that provides: "IT IS FURTHER ORDERED that the Trustee or Successor Trustee shall pay all outstanding legal and accounting fees incurred by the DPH Trust immediately upon receipt of sufficient liquid funds to do so." Considering the decree as a whole and the literal meaning of the language used, we conclude that this sentence does not order Deborah to pay amounts in addition to the specified attorney's fees. *See Wilde*, 949 S.W.2d at 332-33. It merely orders the Trustee to pay fees specifically identified in other paragraphs of the order when the Trust contains sufficient funds to do so. We overrule Deborah's thirty-third issue.

## ATTORNEY'S FEES-DEBORAH'S

In her thirty-fourth, thirty-fifth, and thirty-sixth issues, Deborah contends the trial court should have ordered Robert to pay Deborah's trial and appellate attorney's fees. She argues that the record supports a determination that it was just and equitable for Robert to pay the fees, that the fees are reasonable and necessary, and the trial court abused its discretion by failing to order Robert to pay her attorney's fees incurred in prosecuting her counterclaims and for successful appeals to the court of appeals and the supreme court.

29

We will discuss the requirement that Deborah prove her requested fees are reasonable and necessary. For purposes of this discussion, we assume without deciding that Deborah established all other matters necessary to show an entitlement to attorney's fees.

**Applicable Law**

Under the Texas Property Code, the trial court may award reasonable and necessary attorney's fees as are equitable and just. TEX. PROP. CODE ANN. § 114.064. The grant or denial of attorney's fees lies within the discretion of the trial court. *Lesikar v. Moon*, 237 S.W.3d 361, 375 (Tex. App.–Houston [14th Dist.] 2007, pet. denied). Under an abuse of discretion standard, legal and factual sufficiency of the evidence are relevant factors in assessing whether the trial court abused its discretion. *Id*. Whether attorney's fees are reasonable or necessary are questions of fact for the trier of fact's determination. *Bocquet*, 972 S.W.2d at 21. Unreasonable fees cannot be awarded even if the court believed them to be just. *Id*.

The factors to be considered in determining the reasonableness of attorney's fees include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer performing the services; and
(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2013) (TEX. STATE BAR R. art. X, § 9); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

**Analysis**

At the hearing on Robert's petition to resign as Trustee, Deborah's attorney attempted to admit into evidence an exhibit containing invoices itemizing attorney's fees charged from 2011 through May 20, 2017. The opposing parties objected to the relevance of the evidence, arguing there is no pleading to support it. The court sustained the objection and allowed presentation of the evidence as an offer of proof. In support of the exhibit, Deborah's attorney then testified as to the number of hours worked by multiple attorneys and their respective hourly rates. He stated that

30

the total fees incurred "defending against Mr. Patterson's request for a judicial absolution and approval of his accounting and prosecuting counterclaims is about $302,500." He explained that the majority of that, about $250,000, was spent on the counterclaims and about $50,000 on the accounting. He testified that, if Deborah prevails in the court of appeals she should be entitled to an award of $25,000, if she is successful in pursuing or defeating an application for petition for review in the supreme court she would be entitled to a fee of $15,000, and if she is successful in defeating or prevailing on a petition for review in the supreme court she would be entitled to another $15,000 in attorney's fees. After the attorney completed his testimony, the court restated its previous ruling that the objection lodged by the opposing parties is sustained, and the proffered exhibit and the attorney's testimony on attorney's fees constitute an offer of proof and is not admitted into evidence.

The primary purpose of an offer of proof is to include excluded evidence in the record so the appellate court can determine whether the trial court erred in excluding it. *See* TEX. R. EVID. 103(a)(2); *In re Canales*, 113 S.W.3d 56, 68 (Tex. Rev. Trib. 2003, pet. denied). Here, Robert and Ruth objected to admission of the evidence, the objection was sustained, and the evidence was not admitted. There is no corresponding complaint on appeal that denial of admission into evidence was error. The offer of proof is not evidence of Deborah's attorney's fees. Additionally, notably missing from the testimony is any reference to the reasonableness or necessity of the requested fees.

Even assuming Deborah has established all other matters necessary to show entitlement to attorney's fees, she has not shown the requested fees are reasonable and necessary. Because there is no evidence that the requested attorney's fees would be reasonable and necessary, the trial court did not abuse its discretion by failing to order Robert to pay Deborah's attorney's fees. *See Lesikar*, 237 S.W.3d at 375. We overrule Deborah's issues thirty-four, thirty-five, and thirty-six.

### DISCOVERY ABUSE SANCTIONS

Deborah's issues thirty-seven through forty-two involve sanctions levied against her attorneys for actions taken in an attempt to obtain from a third party information about Robert's business transactions that they felt was pertinent to her counterclaims. Robert pursued sanctions for failure to comply with discovery rules and for engaging in deception.

**Applicable Law**

The Texas Rules of Civil Procedure impose detailed requirements on litigants who wish to obtain information about the case in preparation for trial. *See* TEX. R. CIV. P. 190-205. The rules also provide for imposition of sanctions for the failure to comply with those requirements. TEX. R. CIV. P. 215. Sanctions are used to assure compliance with discovery and to deter those who might be tempted to abuse discovery in the absence of a deterrent. *Cire v. Cummings*, 134 S.W.3d 835, 839 (Tex. 2004).

We review a trial court's ruling on a motion for sanctions using an abuse of discretion standard. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam). The ruling will be reversed if the trial court acted without reference to any guiding rules and principles such that its ruling was arbitrary or unreasonable. *Id*. The appellate court must ensure that the sanctions were appropriate or just. *Id*. To determine whether a sanction is just, we consider whether there is a direct relationship between the offensive conduct and the sanctions imposed and whether less severe sanctions would have been sufficient to promote compliance. *Id*. The appellate court is not bound by the trial court's findings of fact and conclusions of law and we are not limited to a review of the sufficiency of the evidence to support the trial court's findings. *Scott Bader, Inc. v. Sandstone Prods, Inc.*, 248 S.W.3d 802, 812 (Tex. App.−Houston [1st Dist.] 2008, no pet.). Rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion. *Id*.

**Facts**

In May 2013, Craig M. Daugherty, one of Deborah's attorneys, sent an email to a Central Title Company employee attaching a "Subpoena to Appear and Produce Documents" and instructing her that "compliance with the subpoena may be simplified by producing the requested documents attached to the business records affidavit which is included within the subpoena." The style of the case appears at the top of the first page of the attached document. The pertinent portion of the document is as follows:

SUBPOENA TO APPEAR AND PRODUCE DOCUMENTS

To: Central Title Company, 6783 Old Jacksonville Hwy, Tyler, Texas 75703

**BY THIS SUBPOENA**, a Custodian of Records of Central Title Company is **COMMANDED to APPEAR** before the Presiding Judge of the 241st Judicial District Court of Smith County, Texas, in the Smith County Courthouse, 100 N.

Broadway, Room 220, Tyler, Texas 75702 on June 25, 2013 at 11:00 a.m. and continuing day to day thereafter until released by Order of the Court or consent of Deborah Patterson Howard Goughnour to give testimony and provide evidence in a case pending therein, filed under Cause Number 11-2216-C and styled, "In Re: The Deborah Patterson Howard Trust."

**BY THIS SUBPOENA DUCES TECUM**, a Custodian of Records of Central Title Company is **COMMANDED** to produce and permit inspection and copying by the attorneys for Deborah Patterson Howard Goughnour of documents or tangible things in their possession, custody, or control designated and described in Exhibit A attached hereto before the Presiding Judge of the 241st Judicial District Court of Smith County, Texas, in the Smith County Courthouse, 100 N. Broadway, Room 220, Tyler, Texas 75702 on June 25, 2013 at 11:00 a.m.

The document also explained that compliance was required, and the failure to comply could result in a fine or confinement, or both. The final paragraph of the document announced that "**COMPLIANCE WITH THIS SUBPOENA WILL BE EXCUSED IF THE DOCUMENTS DESCRIBED IN EXHIBIT A ARE PROVIDED ALONG WITH A SIGNED, NOTARIZED BUSINESS RECORDS AFFIDAVIT . . . .**" The document is signed by Craig M. Daugherty and lists the names of attorneys Ty Beard, Donald Harris, Jim E. Bullock, and Brian Casper as well as the names, addresses, and telephone numbers of their law firms. Exhibit A requests all documents, information, and communications regarding real estate transactions for Robert and twenty-one entities he or Deborah is associated with.

In response to the subpoena, Central Title Company delivered a substantial number of documents to Deborah's attorneys although the business records affidavit was not executed or delivered. When he learned of the document production, Robert filed a motion to quash the subpoena and for sanctions for discovery abuse asserting that the subpoena did not comply with applicable discovery rules. He complained that his attorneys did not receive a copy of the subpoena, it was not filed with the court, and the subpoena falsely claimed there was a June 25 trial date set. He asserted that the subpoena was a deceptive device used to evade the discovery rules. Citing rules of civil procedure 215.3 and 215.2(b), Robert asked the court to order that Deborah is precluded from conducting any more discovery and using at trial any document obtained through the subpoena, that she is required to turn over to Robert's attorneys all documents obtained through the subpoena, and that she must pay all attorney's fees incurred by Robert, Ruth, or Dean Bailey caused by the issuance of the subpoena.

In response to the motion to quash, Daugherty wrote a letter to Robert's attorney in which he agreed that he failed to follow the notice requirements of Rule 205.2 which is applicable to

discovery from nonparties. He explained that he has used the same procedure for thirty-five years to obtain records from recalcitrant medical providers. He asked that opposing counsel consider the letter a retraction of the subpoena and promised to provide copies of the records received from Central Title Company and to send Rule 205.2 notice for service of the subpoena. Daugherty also filed an amended response to the motion, admitting that the procedure he followed is not authorized by the rules of civil procedure. He argued that the violation of the rules was an inadvertent mistake and inconsequential because Central Title Company did not execute a business records affidavit, rendering the documents that were produced inadmissible.

Robert filed a supplement to his motion, attaching an affidavit of Jerry W. Hill, an owner of Central Title Company, in which he states that Central Title Company produced documents in response to the subpoena. Robert also attached Daugherty's September 19, 2013 affidavit in which Daugherty stated that Hill told him he agreed to produce the documents voluntarily but Hill would not execute an affidavit confirming that the subpoena was not the basis of his decision to produce documents because Hill did not want to create a conflict with Robert. Daugherty explained in the affidavit that he attempted unsuccessfully to depose Hill, opining that he could not adequately respond to the motion for sanctions without Hill's testimony.

The hearing on the motion spanned three non-consecutive days. Robert's attorney, Mary Burdette, complained that Daugherty did not follow Rule 205 which governs discovery from nonparties. She argued that Daugherty tried to use a Rule 176 trial subpoena to conduct discovery, a procedure that has never been valid, and the rules do not allow subpoena of a third party to a hearing or trial. She further complained that she received no notice of the subpoena which was not served in accordance with the rules. She said Robert was prejudiced because about half of the documents Daugherty received involved Robert's personal transactions, information the other side was not entitled to have. Robert testified, identifying documents that involved the Trust and those that did not involve the Trust.

Daugherty said he used rule of evidence 902, the business records affidavit, which does not require notice, and he was not seeking discovery by subpoena. He claimed he was not trying to force production. He explained that he was giving the third party a choice, either comply with the request voluntarily through the business records affidavit or be subpoenaed. He further explained that putting the hearing date in the fake subpoena gave it a little sense of urgency when dealing with a reluctant records custodian. He claimed ignorance of the current rules. Daugherty

also claimed the records are relevant to Robert's breach of fiduciary duty and production of the records created no prejudice. He further stated that he spoke to Hill and that Hill agreed to provide the documents. Daugherty opined that he later attempted to correct his mistake and obtain documents the correct way. He also complained that Robert's attorney did not comply with the local rules which require a conference before filing a motion for sanctions.

At the third hearing, Jerry Hill, part owner of Central Title Company, testified, explaining that he was not physically served with the subpoena but Central Title agreed to produce the documents in accordance with the subpoena. He did not recall telling Daugherty that he did not want to injure his business relationship with Robert. On cross examination, he stated that Central Title would not have produced the documents without a subpoena.

Burdette testified about her attorney's fees in connection with the motion for sanctions. She charged $400 an hour and an associate charged $250 an hour, which she claimed is reasonable and necessary. Together they worked a total of 27.9 hours, and she asked for $18,015 in fees. Richard Lottman, another of Robert's attorneys, said that he worked on this matter for twelve hours at $380 per hour and asked for $4,560. Burdette stated that Robert is not asking to have relevant documents removed, and Daugherty said they did not need Robert's personal documents.

The court determined that a procedure was used that did not meet the requirements of the rules and that the attorneys should be sanctioned. He announced that, as a sanction, he was awarding attorney's fees in the amount of $14,000. He explained that he arrived at that number by allowing thirty-five hours at $400 an hour.

Several months after the third sanctions hearing, the trial court signed an order granting the motion for sanctions. The trial court found that Daugherty, Beard, Harris, Bullock, and Casper sent a false trial subpoena to Central Title Company to avoid compliance with the rules of civil procedure which constitutes a sanctionable abuse of the discovery process under Rule 215.3. The court found that a monetary sanction is authorized by Rule 215.2(b)(8) and ordered Daugherty, Beard, Harris, Bullock, and Casper, jointly and severally, to pay the Trust $14,000 in attorney's fees.[6]

## Analysis

---

[6] The court ordered the attorneys to pay the Trust no later than July 21, 2014. The sanctioned attorneys sought mandamus relief from this order. This court denied the petition for writ of mandamus but ordered the attorneys to pay the sanction into the registry of the court within thirty days of our January 20, 2015 opinion. *In re Beard*, 12-15-00005-CV, 2015 WL 273187, at *2 (Tex. App.–Tyler Jan. 20, 2015, orig. proceeding) (mem. op.).

In her thirty-seventh and fortieth issues, Deborah contends there is legally and factually insufficient evidence to prove her attorneys abused the discovery process, and the trial court abused its discretion by finding that they did, by sanctioning them, and by failing to consider a lesser sanction. She argues that counsel sought to obtain documents from Central Title Company pursuant to Rule of Evidence 902 which supports obtaining business records via voluntary production. She asserts that the order cannot be based on an attempt to avoid compliance with the rules because there was no enforceable subpoena or attempt to serve an enforceable subpoena, thus Central Title Company's production of documents was wholly voluntary and there was no sanctionable conduct. In her thirty-ninth issue, Deborah asserts that the general testimony of Robert's counsel is legally and factually insufficient evidence to support a finding that the attorney's fees Robert requested were reasonable and necessary, and the trial court abused its discretion by ordering Deborah's attorneys to pay those fees as a sanction.

Daugherty sent what he referred to as a fake subpoena to a third party in an attempt to obtain documents, half of which he was not entitled to have. The fake subpoena included a fake trial date. He admitted that he did not know or follow the rules for obtaining documents from a third party. The court also had before it Daugherty's affidavit in which he claimed that Hill said Central Title Company provided the documents voluntarily. In contrast, the court heard Hill's testimony that the documents were produced in response to the subpoena. In spite of Daugherty's assertion that he was not trying to force production, the language of the subpoena was forceful and intimidating. The court could have reasonably determined that Daugherty was trying to fool the recipient of the subpoena. The facts and evidence before the court support its determination that Deborah's attorneys should be sanctioned for the method by which they obtained documents from Central Title Company. The time spent addressing Daugherty's abuse caused prejudice to Robert's attorneys. The punishment, requiring Deborah's attorneys to pay expenses incurred by Robert's attorneys in pursuing sanctions, was tailored to remedy that prejudice. *See **Jones***, 192 S.W.3d at 583.

The judgment reflects that the trial court considered Robert's request, contained in his motion for sanctions, that the court prohibit any further discovery and disallow use of the documents. In open court, the trial court wanted identification of the type of documents provided, and clarification about which documents were not relevant, and which documents were discoverable. The court stated that it was considering excluding everything and asked Burdette to

suggest other possible sanctions. During the proceedings, the court ordered Deborah's attorneys not to look at the documents, indicating there was a possibility that he would not allow their use. The trial court did not order any of the documents excluded. Thus, contrary to Deborah's argument that the court failed to consider lesser sanctions, the record shows that the trial court considered other sanctions and imposed lesser sanctions than it considered. *See id*. The court imposed a sanction that is limited to costs associated with addressing the abuse to promote compliance with the rules. *See **Wilson v. Shamoun & Norman, LLP***, 523 S.W.3d 222, 233 (Tex. App.−Dallas 2017, pet. denied).

Deborah argues that the evidence is insufficient to show the amount of attorney's fees she was ordered to pay is reasonable and necessary. Rule 215.2(8) authorizes the trial court to order a party's attorney to pay reasonable expenses, including attorney's fees, caused by the abuse. TEX. R. CIV. P. 215.2(8). The record shows that Robert's attorneys spent a total of 39.9 hours addressing the sanctions matter. At the first hearing, they asked for $11,600. At the third hearing, which was necessitated by Daugherty's insistence on presenting Hill's testimony, they asked for a total of $22,575. The trial court awarded only $14,000. That amount is supported by the record, and we discern no abuse of discretion in the court's award. *See **Finlay v. Olive***, 77 S.W.3d 520, 527 (Tex. App.−Houston [1st Dist.] 2002, no pet.). The ruling granting the motion for sanctions and ordering Deborah's attorneys to pay Robert's attorneys $14,000 was not arbitrary or unreasonable. *See **Jones***, 192 S.W.3d at 583. We overrule Deborah's thirty-seventh, thirty-ninth, and fortieth issues.

In her thirty-eighth issue, Deborah complains that the trial court erred in sanctioning her attorneys because the order cites to Rule 215.3, which authorizes sanctions against a party, not counsel. In her forty-first issue, Deborah asserts the trial court abused its discretion by ordering that all of her attorneys are jointly and severally liable when Daugherty alone sent the fake subpoena. She argues that there is no evidence that attorneys Ty Beard, Donald Harris, or Jim E. Bullock[7] prepared, signed or sent the complained-of document, and there is no direct relationship between the sanction and any improper conduct by those attorneys.

Deborah filed a motion to modify the sanctions order but did not include either of these complaints. When an attorney fails to complain of the sanction and fails to ask the trial court to reconsider its actions, the attorney waives any complaint about the trial court's action. TEX. R. APP. P. 33.1; ***Victory Energy Corp. v. Oz Gas Corp.***, 461 S.W.3d 159, 181 (Tex. App.−El Paso

---

[7] The order also named attorney Brian Casper. Deborah does not mention Casper.

2014, pet. denied); ***Howell v. Tex. Workers' Comp. Comm'n***, 143 S.W.3d 416, 450 (Tex. App.–Austin 2004, pet. denied). We overrule Deborah's thirty-eighth and forty-first issues.

In her forty-second issue, Deborah contends the trial court abused its discretion by failing to enforce procedural requirements before rendering its sanctions order. Specifically, she complains that Robert's attorneys failed to comply with the local rule requiring opposing counsel to confer with her attorneys before filing the motion for sanctions. Burdette offered no explanation for making no effort to confer with Daugherty, although she stated that opposing counsel obtained documents they were not entitled to, which could not be fixed. Daugherty argued that, had counsel conferred with him, he could have withdrawn the fake subpoena and made a request that complied with the rules.

The local rules for Smith County district courts require a party seeking sanctions to certify that the movant conferred with or made a reasonable effort to confer with opposing counsel in an effort to resolve the dispute without the necessity of court intervention and that the attempt failed. SMITH (TEX.) CIV. DIST. AND CTY. CTS. AT LAW LOC. R. 2.1. Likewise, the rules of civil procedure require that all discovery motions contain a certificate of conference stating that reasonable efforts were used to resolve the pending dispute without the need for court intervention. TEX. R. CIV. P. 191.2.

The failure to confer might affect the scope of the dispute, and thus the amount of attorney's fees billed. ***Clark v. Clark***, 546 S.W.3d 268, 274 (Tex. App.–El Paso 2017, no pet.). However, the certificate of conference is for the court's benefit and the court may choose to enforce it or not at the court's option. *See **Groves v. Gabriel***, 874 S.W.2d 660, 661 n.3 (Tex. 1994) (orig. proceeding) (per curiam).

Here, Burdette's failure to follow the rule requiring a conference did not cause the damage. Furthermore, a pre-motion conference and allowing Daugherty his requested "do-over" would not have erased the abuse. Daugherty sent a misleading, fake subpoena to a third party which responded by sending him documents to which he was not entitled. Under the facts, the court did not abuse its discretion in determining that the motion for sanctions would still be necessary even if the parties conferred before it was filed. *See **Clark***, 546 S.W.3d at 274. We overrule Deborah's forty-second issue.

## DISPOSITION

Because we determined that it is inequitable for Deborah to pay Robert's and Ruth's trial and appellate attorney's bills, we *modify* the trial court's judgment to *delete* the order for Deborah to pay those fees. We *affirm* the trial court's judgment as *modified*.

**BRIAN HOYLE**
Justice

Opinion delivered March 5, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 5, 2019**

**NO. 12-17-00234-CV**

**DEBORAH PATTERSON HOWARD GOUGHNOUR,**
Appellant
V.
**ROBERT H. PATTERSON, JR., TRUSTEE OF THE DEBORAH PATTERSON HOWARD TRUST,**
Appellee

Appeal from the 241st District Court
of Smith County, Texas (Tr.Ct.No. 112216-C)

THIS CAUSE came to be heard on the oral arguments, appellate record and the briefs filed herein, and the same being considered, it is the opinion of this court that there was error in the judgment of the court below. In accordance with this court's opinion of this date, the judgment of the trial court is **modified** as follows:

We **DELETE** the following portion of the trial court's judgment:

> IT IS FURTHER ORDERED that the Trustee, on behalf of the Trust, shall recover from Deborah the sum of $587,585.00 as reasonable attorney's fees and expenses incurred by the Trustee related to Deborah's claims through the trial of this case. In the

40

event of an appeal by Deborah or any Respondent (other than Mrs. Harris) to the Court of Appeals, if the appeal is unsuccessful, the Trustee will be further entitled to recover from Deborah an additional sum of $70,000.00 as reasonable attorney's fees and expenses. In the event that Deborah or any Respondent (other than Mrs. Harris) files a Petition for Review in the Texas Supreme Court, if the appeal is unsuccessful, the Trustee will be further entitled to recover from Deborah an additional sum of $25,000. In the event the Texas Supreme Court grants a Petition for Review and the Trustee prevails, then the Trustee will be further entitled to recover from Deborah an additional sum of $50,000.

IT IS FURTHER ORDERED that Mrs. Harris shall have and recover judgment from and against Deborah in the sum of $53,791.00, as reasonable attorney's fees and expenses incurred by Mrs. Harris through the trial of this case. In the event of an appeal by Deborah or any Respondent (other than Mrs. Harris) to the Court of Appeals, if the appeal is unsuccessful, Mrs. Harris will be further entitled to recover from Deborah an additional sum of $30,000.00 as reasonable attorney's fees and expenses. In the event that Deborah or any Respondent (other than Mrs. Harris) files a Petition for Review in the Texas Supreme Court, Mrs. Harris will be further entitled to recover from Deborah an additional sum of $15,000.00.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below is **AFFIRMED** as modified. It is further ORDERED that all costs of this appeal are hereby adjudged against the party incurring same, for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

41